STATE OF CONNECTICUT *v.* KENNETH WELLS
(AC 26671)

Harper, Rogers and Lavine, Js.

Argued October 12, 2006—officially released April 3, 2007

*Glenn W. Falk*, special public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *John J. Davenport*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Kenneth Wells, appeals from the judgment of conviction, rendered following a jury trial, of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-49 (a) (2), and conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48 (a).[1] The defendant claims that the evidence did not support the verdict. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In December, 2002, the defendant's girlfriend, Mary Homa, filed a criminal complaint against the victim, Jeffrey Wilde. Just prior to a court date related to that complaint, the defendant discovered that the tires on his vehicle had been slashed. The defendant believed that the victim had slashed his tires as a way of sending a warning to him and Homa. The defendant later learned that the victim was on probation and believed that he was going to harm Homa for pressing charges.

In the early morning hours of February 10, 2003, the defendant, Homa and another person, Keith Scheck, drove to the victim's apartment in Naugatuck. At approximately 2 a.m., the victim awoke to the sound of knocking on his apartment door. The blinds covering the window on the upper half of the door were closed, and there were no lights on in the apartment. The victim approached the door, which was located in his kitchen. He observed through the closed blinds the shadows of two persons. He heard voices but was unable to discern the content of any conversation. The defendant, armed with a loaded twelve gauge shotgun, stood outside the door and discharged the weapon. The shotgun blast left

---

[1] The court imposed a total effective term of incarceration of fifteen years, execution suspended after seven years, followed by five years of probation.

a large hole in the door near the door handle, and shotgun pellets caused significant damage to some kitchen appliances that were located in the area behind the door. The defendant then walked to the victim's driveway, to a position approximately twenty-five feet from the doorway, and discharged the shotgun a second time in the direction of the doorway. Shotgun spray impacted the front door and the front of the apartment. The victim stepped away from the doorway moments before the defendant fired the first gunshot and immediately dialed 911 to report the incident. The victim did not sustain physical injury.

The defendant ran from the victim's residence, traveling behind some nearby homes. He tossed his shotgun over a fence and began walking along the victim's street, where he was detained, and later arrested, by police who had responded to the victim's 911 call. Police later found the defendant's shotgun, in the firing mode with a live round in its chamber, in the vicinity of the victim's apartment. Police en route to the shooting scene also observed a vehicle, with its headlamps off, traveling on the victim's street as they approached. When police stopped the vehicle, they discovered Homa driving the vehicle, with Scheck as a passenger. A shotgun case was plainly visible on the vehicle's backseat and, during a later search, police investigators found the defendant's checkbook in the vehicle. Upon initial questioning by police, the defendant denied any involvement in the shooting. Later, the defendant provided police with a statement detailing his conduct.[2]

---

[2] The defendant's statement provides in relevant part: "On [the night of the shooting], at about 6:30 p.m., I began drinking at several different bars, within Naugatuck. While out drinking, I drank about a case of Bud beer and a couple of shots of brandy. I am not sure what time I left the bars. When I left the bar, I was in a fit of rage due to a confrontation that my girlfriend Mary Homa had with a Jeff Wilde back in December. I know Mary had contacted the police and Jeff had been arrested. However, nothing happened to Jeff. Jeff had a court date on January 27, 2003, and on January 26, 2003, my car tires had been slashed. I felt that Jeff was giving Mary and I warning about her testimony against him. On February 6, 2003, Mary and

As he did at trial,[3] the defendant claims that the evidence did not support the charges against him. The claims raised by the defendant concern his intent and that of his alleged coconspirator, Homa.

"The appellate standard of review of sufficiency of the evidence claims is well established. In reviewing a sufficiency [of the evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"The evidence must be construed in a light most favorable to sustaining the jury's verdict. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . [T]he inquiry into whether the record evidence would support a finding of guilty beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence

---

I heard from the court. I became angry the court was so lenient with Jeff. I was afraid now that Jeff was on probation, he was going to hurt Mary for pressing charges. I went home to my house and got my twelve gauge shotgun, loaded it and placed two other rounds in the tube. Now acting in a fit of rage, I went over to Jeff's home. I knocked on Jeff's door two or three times. When no one answered the door, I shot off one round into the lower half of the kitchen door. I then ran down the stairs and into the driveway. At the corner of the driveway, I held the shotgun at the right side of my body in the direction of the kitchen door and shot off one more round. I then ran off running down Curtis Street. I ran behind some houses and came up to a chain link fence. At this time, I threw the shotgun over the fence and proceeded to walk back out onto Curtis street. I walked from Curtis Street to North Main Street where I was arrested."

[3] The defendant orally moved for a judgment of acquittal, both at the end of the state's case and at the end of the trial. The court denied both of these motions. The defendant also filed a written motion for a judgment of acquittal, which the court denied prior to sentencing.

. . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . .

"We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. . . . We are content to rely on the [jury's] good sense and judgment." (Internal quotation marks omitted.) *State* v. *Ramirez*, 94 Conn. App. 812, 821, 894 A.2d 1032, cert. denied, 278 Conn. 915, 899 A.2d 621 (2006).

"Where . . . factual issues exist that are related to a defendant's intent, we recognize that such factual issues are characteristically proven by circumstantial evidence. . . . It is obvious that direct evidence of the accused's state of mind is rarely available and, therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *McCoy*, 91 Conn. App. 1, 7, 879 A.2d 534, cert. denied, 276 Conn. 904, 884 A.2d 1026 (2005).

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining

whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Because [t]he only kind of an inference recognized by the law is a reasonable one [however] . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Citations omitted; internal quotation marks omitted.) *State* v. *Elsey*, 81 Conn. App. 738, 744–45, 841 A.2d 714, cert. denied, 269 Conn. 901, 852 A.2d 733 (2004). Having set forth some of the general principles that govern our review, we turn to the essential elements of the crimes at issue.

I

To obtain a conviction for attempt to commit assault in the first degree in violation of §§ 53a-49 (a) (2) and 53a-59 (a) (1), as charged, the state bore the burden of proving beyond a reasonable doubt that the defendant (1) acted with the intent to cause serious physical injury to another person and (2) intentionally did or omitted to do anything which, under the circumstances as he

believed them to be, was an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime of assault in the first degree. "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ." General Statutes § 53a-59 (a).

The defendant challenges only whether the state proved beyond a reasonable doubt that he intended to cause serious physical injury. He argues that, when he fired a shotgun from the victim's front porch, the victim was not in a position to be harmed by his actions. He argues that the victim moved away from the door before he fired the first shot, that it was dark inside the kitchen and that "there was no evidence to show that [he] was shooting at the person of [the victim] when he fired either [gun]shot." The defendant also relies on the fact that there was no evidence that the victim "had direct contact" with him before the shooting and that the 911 call made by the victim did not reflect the victim's understanding that he had been the target of a shooter but that his front door had been "blown out." On the basis of this view of the evidence, the defendant argues that reckless endangerment in the first degree in violation of General Statutes § 53a-63 (a) was the most serious crime for which the state could have obtained a conviction.

"[T]he defendant's state of mind at the time of the shooting may be proven by his conduct before, during and after the shooting. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." (Internal quotation marks omitted.) *State* v. *McCoy*, supra, 91 Conn. App. 7. A fact finder may also infer an intent to cause

serious physical injury from other circumstantial evidence such as the type of weapon used and the manner in which it was used. *State* v. *Brooks*, 88 Conn. App. 204, 212, 868 A.2d 778, cert. denied, 273 Conn. 933, 873 A.2d 1001 (2005).

Unlike the defendant, we do not view the evidence in the light most favorable to a finding of his innocence but in the light most favorable to sustaining the verdict. Here, there was evidence that the defendant arrived at the victim's residence at approximately 2 a.m., armed with a twelve gauge shotgun. The defendant admitted in his statement that he was very angry at the victim as a result of an incident concerning the defendant and his girlfriend, Homa. The defendant characterized his mindset at the time of the shooting as a "fit of rage . . . ."

The defendant carried the shotgun to the door of the victim's residence and knocked at the door. The defendant did not immediately discharge his shotgun; the evidence reflects that the victim got out of his bed and walked into the kitchen where he overheard voices near the door. After the victim initially surveyed the situation, he turned away to walk down a hallway and get dressed. At this point, the defendant discharged his shotgun, sending pellets through the door. The defendant thereafter walked to the victim's driveway and discharged the shotgun a second time, in the direction of the doorway. The defendant ran from the residence, abandoned his shotgun and was soon apprehended by police.

On the basis of these facts, the jury could have drawn the following reasonable inferences. The defendant chose to go to the victim's residence at 2 a.m. because it was a time of day when the victim, like other persons, might be expected to be at home. The defendant knocked at the door because the act of knocking on

a door normally summons someone to the door. The defendant did not discharge his shotgun immediately but waited long enough that the victim had an opportunity to get out of bed, enter his kitchen near the doorway and observe and hear the things that he did. The defendant successfully lured a person to the doorway before he discharged his shotgun through the very midsection of the door.

We may assume that the jury applied its common knowledge that a twelve gauge shotgun is an instrument readily capable of inflicting serious physical injury. The evidence reflected that the shotgun blast caused significant damage to the door and the kitchen area behind it. Appliances in the kitchen were riddled with pellet damage. The defendant discharged the shotgun a second time from the victim's driveway, causing additional damage to the door and the surrounding area. The jury reasonably could have inferred that the defendant fired on the doorway from the driveway, moments after firing through the door itself, in an attempt to cause serious physical injury to someone who may have entered the kitchen or the area of the doorway after hearing the first gunshot. The facts that the defendant lured the victim, a person toward whom he had strong negative feelings, to the door and used a shotgun in the manner that he did supports a finding that the defendant acted while intending to cause serious physical injury.

The defendant's argument, resting on the facts that the victim had stepped away from the door just moments before the defendant fired the first gunshot into the doorway and that the victim did not sustain physical injury is not persuasive. The defendant implicitly argues that the jury could have found that he was merely attempting to frighten the victim. This argument is inconsistent with our analysis because the evidence

amply supported a finding that he acted with the intention to cause serious physical injury. As stated previously, the evidence supports a finding that the defendant lured the victim to the door. Although the victim testified that the lighting conditions were such that he could discern shadows outside of his door and that he was able to hear voices, the jury could reasonably have concluded that the defendant likewise had some opportunity to observe the victim's shadow moving about the residence or to hear the victim's approach to the door, thus alerting him to the fact that his attempt to lure the victim to the door was successful. If the defendant discharged his shotgun into the residence knowing that someone was located in the vicinity of the door, it would further support a finding that the defendant acted with the intention to cause serious physical injury. Certainly, the fact that the victim was not harmed physically has no bearing on our analysis of the defendant's criminal intent.

Accordingly, viewing the facts that might reasonably have been found by the jury, as well as the reasonable inferences to be drawn from such facts, we conclude that the cumulative effect of the evidence supported the jury's finding that the state proved the essential element at issue.

## II

To obtain a conviction for conspiracy to commit assault in the first degree in violation of §§ 53a-48 (a) and 53a-59 (a) (1), as charged, the state bore the burden of proving beyond a reasonable doubt that the defendant (1) intended that conduct constituting the crime of assault in the first degree be performed, (2) agreed with one or more persons to engage in or cause the performance of such conduct and (3) that any one of those persons committed an overt act in pursuance of such conspiracy. "Conspiracy is a specific intent crime,

with the intent divided into two parts: (1) the intent to agree to conspire; and (2) the intent to commit the offense that is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also they intended to commit the elements of the offense." (Internal quotation marks omitted.) *State* v. *Vasquez*, 68 Conn. App. 194, 209, 792 A.2d 856 (2002).

The defendant does not appear to claim that the evidence did not support a finding that he and Homa agreed to conspire; he claims only that the evidence was insufficient to prove that he and Homa shared the common intent to commit the crime of assault in the first degree. The defendant argues that, although the evidence supported a finding that Homa drove the defendant to the victim's residence, there was no evidence concerning Homa's purpose for doing so.

We already have concluded that the jury reasonably could have found that the defendant acted with the intent to cause serious physical injury to another person and attempted to commit assault in the first degree by the use of a shotgun. To prove the conspiracy charge, the state needed to prove beyond a reasonable doubt that the defendant and Homa shared the intent that the crime of assault in the first degree be committed.

As we evaluate whether Homa and the defendant shared this common intent, we first look to the nature of the relationship between the defendant and Homa. See *State* v. *Henderson*, 83 Conn. App. 739, 748–49, 853 A.2d 115 (evidence of nature of relationship between alleged coconspirators relevant to issue of existence and object of conspiracy), cert. denied, 271 Conn. 913, 859 A.2d 572 (2004). The jury reasonably could have found that the defendant and Homa were involved in

a romantic relationship; they were not mere acquaintances. A dispute between Homa and the victim escalated to such a level that Homa had filed a criminal complaint against the victim only a few months prior to the shooting. The evidence supported a finding that both the defendant and Homa were actively interested in the progress of the victim's criminal prosecution and that they shared feelings of disappointment and anger at what they perceived to be lenient treatment given to the victim. These feelings existed at the time of the incident at issue in this appeal. The defendant believed that the victim had retaliated against him by slashing his tires, and he feared for Homa's safety. Given the significant animosity that existed between the defendant and Homa, on the one hand, and the victim, on the other hand, the jury could reasonably have inferred that Homa shared the defendant's dislike of the victim and that she had a motive to cause him serious physical injury at the time of the shooting.

We next examine the evidence of Homa's conduct and knowledge at the time of the shooting. The defendant does not appear to challenge that the jury reasonably could have found that Homa drove the defendant to the victim's residence prior to the shooting, at 2 a.m., and that when the defendant exited the vehicle being driven by Homa, he was armed with a shotgun. This finding was supported by the evidence that Homa was found driving on the victim's street shortly after the shooting, that the case for the defendant's shotgun was on the backseat of her vehicle and that the defendant's checkbook was in her vehicle. Police responding to the scene of the shooting found Homa driving near the scene with her vehicle's headlamps turned off. The jury reasonably could have inferred that Homa was attempting to evade detection while she waited to transport the defendant away from the scene.

The jury reasonably could have drawn several inferences from these facts, including that Homa and the defendant were acting as coconspirators at the time of the shooting. "It is fundamental criminal jurisprudence that the state is not required to prove the existence of a formal agreement between the coconspirators. . . . It is sufficient to show that they knowingly engaged in a mutual plan to do a forbidden act." (Citation omitted.) *State* v. *Smith*, 36 Conn. App. 483, 486, 651 A.2d 744 (1994), cert. denied, 233 Conn. 910, 659 A.2d 184 (1995).

It was also reasonable for the jury to find that, when the defendant attempted to commit the crime of assault in the first degree, he was acting in furtherance of the conspiracy. It was reasonable to infer that Homa disliked the victim and was aware that the defendant was in a "fit of rage" over the victim just prior to the shooting. Homa drove the defendant to the victim's residence at 2 a.m., and Homa was aware that the defendant possessed a shotgun when he left her vehicle. The facts that the incident occurred at the hour of the day that it did and that the defendant possessed a shotgun are significant for the same reasons we discussed in part I. Police found Homa driving on the defendant's street, waiting for the defendant after the shooting while making efforts to evade detection. These facts enabled the jury to infer reasonably that Homa did not intend to merely send some type of a message to the victim but that she and the defendant were motivated by common feelings of anger, fear and revenge. The cumulative effect of the facts and the reasonable inferences to be drawn therefrom permitted the jury to find that Homa, like the defendant, intended to cause serious physical injury to the victim by means of a deadly weapon or a dangerous instrument.

The judgment is affirmed.

In this opinion the other judges concurred.