# STATE OF CONNECTICUT *v.* TRAVIS DOUGLAS
## (AC 31146)

DiPentima, C. J., and Bear and Flynn, Js.

Argued October 13, 2010—officially released January 25, 2011

*Glenn W. Falk*, special public defender, with whom, on the brief, was *Jennifer Rae Taylor*, law student intern, for the appellant (defendant).

*Nancy L. Walker*, special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Ann P. Lawlor*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Travis Douglas, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit assault in the first degree with intent to cause physical injury to another person by means of the discharge of a firearm in violation of General Statutes §§ 53a-48 and 53a-59 (a) (5), conspiracy to commit assault in the first degree by means of a deadly weapon or dangerous instrument in violation of §§ 53a-48 and 53a-59 (a) (1), reckless

endangerment in the first degree in violation of General Statutes § 53a-63 and carrying a pistol without a permit in violation of General Statutes § 29-35.[1] On appeal, the defendant claims that (1) there was insufficient evidence adduced at trial to sustain his conviction of conspiracy to commit assault in the first degree, reckless endangerment in the first degree and carrying a pistol without a permit, and (2) the trial court improperly admitted evidence of his prior uncharged misconduct. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. After moving from New Haven to Meriden, the defendant and his brother, Tavonne Douglas, became associated with a group of individuals known as the "New Haven boys." While attending Maloney High School in Meriden, animosity developed between the New Haven boys and members of the Twiss Street gang "over girls." This animosity frequently erupted into open acts of hostility, and the Meriden police department has made twenty to twenty-five arrests as a result of fights at the school between members of the two groups.

In a statement made to the Meriden police department on January 18, 2008, Robert Rios, who considered the defendant his best friend, recounted that the defendant had told him that the day after one of those fights in January, 2008, the defendant and his brother were standing outside the defendant's home when they were approached by a group of "guys and girls . . . ." Feeling threatened, the defendant pulled out "a 38 or 32 revolver gun" that he had obtained from his cousin, Trevor Witherspoon, and fired two gunshots into the crowd. No one was hit on this occasion. Rios further recounted that the gun used on that occasion was given

---

[1] Subsequent to closing argument and prior to the jury charge, the state filed an amended information withdrawing one count of unlawful discharge of a firearm in violation of General Statutes § 53-203.

back to Witherspoon, who took it back to New Haven. Rios also stated that the defendant had told him that he intended to buy another gun that day, which would be used "to shoot somebody or shoot up a party . . . ."

Approximately four months later on April 30, 2008, longtime Meriden resident Heriberto Adorno was driving his truck on Liberty Street in Meriden with his wife when he passed three individuals wearing "shiny" jackets. Two of the jackets were hooded and black, one with a shiny gold leafy design, and the other with a silver tree and leaf design. Adorno thought the jackets were "funny looking" and shared a laugh with his wife. After passing these three individuals, Adorno testified, he "looked in the [rearview] mirror [of his truck, and] they began to shoot." Although neither Adorno nor his wife saw a weapon, they both heard what they described as gunshots, and Adorno saw all three individuals he had passed with their hands positioned as if shooting a gun.[2] Adorno then saw these three individuals run together along Liberty Street to Center Street.

[2] The questioning of Adorno was conducted through an interpreter. Adorno testified, in part, as follows:

"[Defense Counsel]: When you claim that you look out your rearview mirror and *you see some party shooting*, a shooting, you hear the sound of shooting. Isn't that correct?

"[The Witness]: *Yes. I heard and I saw those three like that.*

"[Defense Counsel]: Okay. So, his testimony is that he sees everyone having their hands like this, but he sees no weapon. Is that correct?

"[The Interpreter]: I'm sorry. Can you—can—

"[Defense Counsel]: His testimony is that he sees all of the individuals with their hands in some type of manual position like this, but he's unable to see what any individual has in their hands. Is that correct?

"[The Witness]: No. No, but I heard the sound.

"[Defense Counsel]: Correct. So, you heard the sounds, but by just hearing the sounds, that could've just been one individual shooting a gun. Isn't that correct?

"[The Witness]: I know that there were three.

"[Defense Counsel]: Three individuals present?

"[The Witness]: Yes. Three persons.

"[Defense Counsel]: Okay. But he's unable to identify that there were any weapons. Isn't that correct?

"[The Witness]: No. At no time." (Emphasis added.)

At no time did Adorno or his wife see the faces of these individuals.

Fearful for the safety of the children and adults that she had observed sitting on a nearby porch, Adorno's wife called 911 to report the incident. Members of the Meriden police department discovered four .38 caliber bullet shell casings on Liberty Street, which is a busy side street. One of the shells had a very fresh odor of gunpowder residue suggesting recent gunfire. The fact that none of the shell casings had been destroyed by car traffic also indicated that they had been recently discharged.

While canvassing the scene for witnesses, Detective John Williams spoke with a witness with whom he was familiar and who had provided him with reliable information about criminal activity in the past. Officer Brian Sullivan interviewed a group of visibly shaken teenage girls who were found in the vicinity of the crime scene on Liberty Street. On the basis of those interviews and the information provided by the Adornos, the Meriden police determined that the New Haven boys had shot at the Twiss Street gang and that the parties responsible for the shooting were outside 570 Broad Street, the home of the defendant.

Thereafter, Meriden police officers were dispatched to the home of the defendant where the defendant, his brother and Witherspoon were standing outside without jackets. After obtaining a search warrant, members of the Meriden police department searched the defendant's home and discovered two jackets matching the descriptions given by the Adornos. The defendant identified the black jacket with a silver tree or leafy design found on a couch inside the home as his own. The defendant's brother identified as his the jacket with the shiny gold leafy design that was found on a bed inside the home. The police took the two jackets into custody

and showed them to the Adornos, who positively identified them as the same ones they had seen worn by the individuals involved in the shooting incident earlier that evening. The defendant, his brother and Witherspoon were then arrested. While the police were processing the defendant, they discovered that he is left-handed.

After being read his *Miranda*[3] rights, the defendant admitted to the police that he was at the scene of the shooting with his brother and Witherspoon where he encountered some of the boys on that block who had a "beef" with him and who were "messing" with him. The defendant, however, claimed that he did not know who fired the gunshots and that his group ran home after he heard the gunshots. More than six hours after the shooting, samples were taken from the hands of the defendant, his brother and Witherspoon. A gunshot residue test performed later returned negative results on all three samples. A gunshot residue test performed on the defendant's jacket, however, returned a positive result for lead at the opening to the left-hand pocket.[4] Similarly, a gunshot residue test performed on the jacket belonging to the defendant's brother detected the presence of lead on the cuff of the left sleeve. An analysis of the shell casings performed at the state forensic science laboratory determined that they were .38 Remington casings, all fired from the same weapon,

---

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] Fung Kwok, a scientist at the state forensic science laboratory, testified that gunshot residue is composed of particles from three major elements: lead, barium and antimony. Kwok also testified that gunshot residue, like chalk powder from a blackboard, readily can be washed and wiped away. Kwok explained that a gunshot residue test will recover significantly less of the three major elements if the test sample is taken more than four hours after the firing of a gun. Kwok testified that it is for this reason that a negative gunshot residue test does not indicate conclusively that a person did not fire a gun. Further, a gunshot residue test that returns a positive result for lead only is not conclusive proof that a person fired a gun, as lead is a very common element in the environment.

a semiautomatic pistol with a barrel no longer than six inches.

A jury trial was held on January 29 and 30, 2009. On February 3, 2009, the jury found the defendant guilty on all counts, and on March 31, 2009, the court sentenced him to eight years incarceration, followed by eight years of special parole.[5] Additional facts will be set forth where necessary.

I

The defendant first claims that there was insufficient evidence adduced at trial to sustain his conviction of (1) conspiracy to commit assault in the first degree, (2) reckless endangerment in the first degree and (3) carrying a pistol without a permit. We disagree.

We begin by setting forth our standard of review. "[F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried . . . . Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error. . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial." (Internal quotation marks omitted.) *State* v. *Nasheed*, 121 Conn. App. 672, 682, 997 A.2d 623, cert. denied, 298 Conn. 902, 3 A.3d 73 (2010).

"The appellate standard of review of sufficiency of the evidence claims is well established. In reviewing a sufficiency [of the evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the

---

[5] At sentencing, the court merged the conviction on the two conspiracy counts.

evidence established guilt beyond a reasonable doubt. . . .

"The evidence must be construed in a light most favorable to sustaining the jury's verdict. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . [T]he inquiry into whether the record evidence would support a finding of guilty beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . .

"We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. . . . We are content to rely on the [jury's] good sense and judgment." (Internal quotation marks omitted.) *State* v. *Wells*, 100 Conn. App. 337, 341–42, 917 A.2d 1008, cert. denied, 282 Conn. 919, 925 A.2d 1102 (2007).

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves

the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Because [t]he only kind of an inference recognized by the law is a reasonable one [however] . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) Id., 342–43. With these principles in mind, we now turn to the elements of the individual crimes in the defendant's conviction.

## A

The defendant, by way of analogy to the factual circumstances in *State* v. *Estrada*, 28 Conn. App. 416, 421–22, 612 A.2d 110, cert. denied, 223 Conn. 925, 614 A.2d 828 (1992), contends in his brief that there was insufficient evidence adduced at trial to "permit the jury reasonably and logically to infer that [he] agreed to engage in the criminal activity which was the object of the alleged conspiracy." We disagree.

"To establish the crime of conspiracy under § 53a-48 . . . the state must show that there was an agreement

between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators." (Internal quotation marks omitted.) *State* v. *Millan*, 290 Conn. 816, 825, 966 A.2d 699 (2009). "While the state must prove an agreement, the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons." (Citations omitted; internal quotation marks omitted.) *State* v. *Taylor*, 239 Conn. 481, 495–96, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997). "The state need not prove that the defendant and a coconspirator shook hands, whispered in each other's ear, signed papers, or used any magic words such as we have an agreement." (Internal quotation marks omitted.) *State* v. *Sanchez*, 84 Conn. App. 583, 588, 854 A.2d 778, cert. denied, 271 Conn. 929, 859 A.2d 585 (2004).

"The state must also show intent on the part of the accused that conduct constituting a crime be performed." (Internal quotation marks omitted.) *State* v. *Millan*, supra, 290 Conn. 825. "Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired

offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 167, 869 A.2d 192 (2005).

"A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . or (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm." General Statutes § 53a-59 (a). Thus, to obtain a conviction for conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (1) and (5), the state needed to prove beyond a reasonable doubt that (1) the defendant entered into and intended to enter into an agreement, (2) intending to cause serious physical injury to another person by means of a deadly weapon and intending to cause physical injury to another person by means of the discharge of a firearm, and (3) one of the conspirators committed an overt act in furtherance of the crime agreed upon.

The defendant appears to challenge the sufficiency of the evidence in establishing the first element beyond a reasonable doubt. Specifically, the defendant argues that, as in *State* v. *Estrada*, supra, 28 Conn. App. 416, because no one actually witnessed a gun being fired, no gun was found, no one actually identified a shooter, and the defendant, his brother and Witherspoon all tested negative for gunshot residue six hours after the shooting, there was insufficient evidence to prove that the defendant entered into, or intended to enter into an agreement or conspiracy to commit assault in the first degree. We disagree.

"It is necessary that a defendant have the mental state required for the commission of a crime while

intentionally aiding another. [M]ere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate, or consummate it." (Internal quotation marks omitted.) *State* v. *Hanks*, 39 Conn. App. 333, 339, 665 A.2d 102, cert. denied, 235 Conn. 926, 666 A.2d 1187 (1995).

"[T]he question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Internal quotation marks omitted.) *State* v. *Pettigrew*, 124 Conn. App. 9, 32, 3 A.3d 148, cert. denied, 299 Conn. 916, 10 A.3d 1052 (2010). "[T]he defendant's state of mind may be proven by his conduct before, during and after the shooting." *State* v. *Williams*, 94 Conn. App. 424, 433, 892 A.2d 990, cert. denied, 279 Conn. 901, 901 A.2d 1224 (2006).

The defendant's reliance on *State* v. *Estrada*, supra, 28 Conn. App. 416, is misplaced. In that case, the defendant's conviction of conspiracy to commit murder was reversed by this court upon a determination that "the stacking of reasonable inferences the jury was required to draw was built on a weak foundation that failed to establish *any semblance* of the defendant's participation in an agreement to engage in a conspiracy."

(Emphasis added.) Id., 422. Notably, "the only noncircumstantial connection between the defendant [and the alleged shooters] was their presence together in the van after the shooting." Id.

The present case, however, is distinguishable. To begin, the defendant was alleged to have conspired with his brother, with whom he lived, and Witherspoon. This connection between the defendant and his brother was fortified by the fact that they were associated with a group known in Meriden as the New Haven boys. Through Rios' statement, the jury heard evidence of prior coordinated activity between the defendant, his brother and Witherspoon in acquiring, transferring and using firearms.

Williams testified as to the significant animosity and open acts of hostility occurring between the New Haven boys and the Twiss Street gang. Williams further testified that the defendant admitted that he was at the scene of the shooting with his brother and Witherspoon where he had encountered people from the Twiss Street neighborhood who had a "beef" with him and were "messing" with him, permitting the reasonable inference that the defendant had encountered members of the Twiss Street gang at the scene of the shooting.

Adorno testified that on the day of the shooting, he drove by three people walking on Liberty Street together, two of whom were wearing distinctive jackets he later was able to identify. Shortly after he drove by those three individuals, he "looked in the [rearview] mirror [of his truck, and] they began to shoot," and he heard what sounded like gunshots. Adorno specifically testified that he witnessed all three individuals holding their hands in a shooting position. He then saw the three persons flee the scene together. Williams testified that the distinctive jackets later shown to Adorno to identify were taken from the defendant's home and that

the defendant and his brother admitted to owning the two jackets. Williams further testified that he found four recently discharged .38 caliber shell casings at the scene of the shooting.

Cumulatively, the evidence and reasonable inferences drawn therefrom established that (1) the defendant and his brother lived together and were members of the New Haven boys, (2) the New Haven boys previously had been involved in several acts of open hostility with members of the Twiss Street gang, (3) the defendant, his brother and Witherspoon previously had acted in a coordinated manner to acquire, transport and use a firearm, (4) the defendant arrived at the scene of the shooting with his brother and Witherspoon, (5) they encountered members of the Twiss Street gang, (6) all three of them held their hands as if shooting a gun, (7) gunshots were heard, (8) one of them fired four gunshots from a .38 caliber firearm and (9) all three of them fled the scene together.

On appeal, we do not ask whether we believe "that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Wells*, supra, 100 Conn. App. 341–42. In addition, "[a] conspiracy can be formed . . . in a very short time period . . . ." (Internal quotation marks omitted.) *State* v. *Millan*, supra, 290 Conn. 826.

The jury reasonably could have inferred that the defendant had entered into, and had intended to enter into, an agreement to commit assault in the first degree with his brother and Witherspoon on the basis of the following: (1) the defendant's association with his brother as a member of the New Haven boys; see, e.g.,

*State* v. *Wells*, supra, 100 Conn. App. 348 (evidence of nature of relationship between alleged coconspirators relevant to issue of existence and object of alleged conspiracy); (2) his prior coordinated activity in acquiring and using a firearm with his brother and Witherspoon, (3) his arrival and departure from the scene of the shooting with his brother and Witherspoon; see, e.g., *State* v. *Elsey*, 81 Conn. App. 738, 747, 841 A.2d 714 ("the jury could have based at least part of its decision regarding the conspiracy charges on the defendant's decision to come to the scene of the crime with the coconspirators, stay at the scene while the crimes were committed and leave the scene with the coconspirators"), cert. denied, 269 Conn. 901, 852 A.2d 733 (2004); and (4) eyewitness testimony establishing that the defendant, his brother and Witherspoon all positioned their hands as if shooting a gun at the scene of the shooting where gunshots were heard and recently discharged bullet casings were found.

B

The defendant next claims that there was insufficient evidence adduced at trial to sustain his conviction of reckless endangerment in the first degree in violation of § 53a-63. Section 53a-63 (a) provides: "A person is guilty of reckless endangerment in the first degree when, with extreme indifference to human life, he recklessly engages in conduct which creates a risk of serious physical injury to another person." The defendant contends that reversal of his conviction is required because the state failed to establish that he fired the gun, and, accordingly, the state did not demonstrate that he evinced an extreme indifference to human life or engaged in conduct that by itself created a risk of physical injury to another person. We disagree.

General Statutes § 53a-3 (13) provides: "A person acts 'recklessly' with respect to a result or to a circumstance

described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ."

As presented in part I A of this opinion, the state adduced multiple pieces of evidence that cumulatively allowed the jury reasonably to infer that the defendant had either fired a gun himself or actively participated in a plan with his brother and Witherspoon to shoot at members of the Twiss Street gang. Adorno testified that he drove by three individuals, two of whom were wearing distinctive jackets he later was able to identify, and, shortly after passing them, he looked in the rearview mirror of his truck and saw them shooting. Adorno also testified that he heard gunshots and saw all three individuals position their hands in a shooting posture. Williams testified that he found two distinctive jackets fitting Adorno's description of them at the defendant's home and that the defendant and his brother admitted to owning the jackets. Williams further testified that four recently discharged .38 caliber bullet casings were found at the scene. Rios' statement recounted that the defendant previously had possessed a .38 caliber gun. In addition, a forensic analysis of the defendant's jacket detected the presence of lead, one of the major components of gunshot residue, at the opening of the jacket's left-hand pocket. Williams testified that the defendant is left-handed. Finally, Williams testified that the shooting occurred on a busy side street in a residential neighborhood, and eyewitness testimony established the presence of adults and children in the area of the shooting.

On the basis of the foregoing, it was reasonable for the jury to conclude that the defendant had fired a .38 caliber firearm four times, and that such conduct

recklessly created a risk of serious physical injury and evinced an extreme indifference to human life. In addition, even if the jury determined that the defendant did not fire a gun, it could reasonably have concluded that he actively participated in a planned confrontation and shoot-out with members of the Twiss Street gang on a busy street in the midst of a heavily populated residential neighborhood with adults and children present. It was reasonable for the jury to conclude that such conduct recklessly created a risk of serious physical injury and that it evinced an extreme indifference to human life. See, e.g., *State* v. *Hart*, 118 Conn. App. 763, 781, 986 A.2d 1058 ("[t]he defendant's conduct, in which he facilitated and participated in a confrontation between a victim and four masked individuals, one armed . . . on a dead-end residential street, evidenced an extreme indifference to human life . . . [and the] jury had sufficient evidence to support the defendant's conviction of reckless endangerment in the first degree"), cert. denied, 295 Conn. 908, 989 A.2d 604 (2010).

C

The defendant next claims that the evidence adduced at trial was insufficient to sustain his conviction of carrying a pistol without a permit in violation of § 29-35. In relevant part, § 29-35 (a) provides: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same . . . ." General Statutes § 29-35 (a). Thus, to obtain a conviction for carrying a pistol without a permit, the state was required to prove beyond a reasonable doubt that the defendant (1) carried a pistol, (2) for which he lacked a permit, (3) while outside his dwelling house or place of business. See *State* v. *L'Minggio*, 71 Conn. App. 656, 672, 803 A.2d 408, cert. denied, 262 Conn. 902, 810 A.2d 270 (2002). The defendant does not challenge the jury's conclusion that he

was without a permit to carry a pistol; rather, the defendant claims that the evidence presented was insufficient to show beyond a reasonable doubt that he *carried* a pistol and that he did so while *outside* of his dwelling house. We disagree.

As discussed in part I A of this opinion, the defendant admitted to police that he was at the scene of the shooting with his brother and Witherspoon, and circumstances permitted the reasonable inference that he, or one member of his group, had fired a .38 caliber pistol four times at members of the Twiss Street gang. In addition, no gun was found at the scene or at the defendant's home, and the jury heard that forensic tests of the defendant's jacket found traces of lead, one of the major components of gunshot residue, at the opening to the left-hand pocket.

On the basis of this evidence and reasonable inferences drawn therefrom, the jury reasonably could have concluded that the presence of lead in the defendant's coat pocket was attributable to gunshot residue and had been deposited on the jacket at or near the scene of the shooting. Although evidence of lead without the presence of barium and antimony arguably is inconsistent with gunshot residue and may have supported the defendant's claim of innocence, "it is not the province of this court to determine whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. Rather, we must determine whether there is a reasonable view of the evidence that supports the court's judgment of guilty." *State* v. *Santos*, 104 Conn. App. 599, 614, 935 A.2d 212 (2007), cert. denied, 286 Conn. 901, 943 A.2d 1103, cert. denied, 555 U.S. 851, 129 S. Ct. 109, 172 L. Ed. 2d 87 (2008).

After a thorough review of the evidence and the reasonable inferences it permitted, we conclude that there was sufficient evidence adduced at trial to support the

defendant's conviction of conspiracy to commit assault in the first degree by means of a deadly weapon or dangerous instrument in violation of §§ 53a-48 and 53a-59 (a) (1), conspiracy to commit assault in the first degree with intent to cause physical injury to another person by means of the discharge of a firearm in violation of §§ 53a-48 and 53a-59 (a) (5), reckless endangerment in the first degree in violation of § 53a-63 and carrying a pistol without a permit in violation of § 29-35.

## II

The defendant next claims that the court improperly admitted evidence of his prior uncharged misconduct. Specifically, the defendant contends that the statement given to police by his friend, Rios, was (1) not relevant because it did not advance the state's burden of proof and was given four months prior to the incident in issue and (2) its limited probative value was outweighed by its prejudicial effect because (a) it cast the defendant as a drug-using, gun toting criminal with a proclivity for shooting people and (b) evidence of motive readily was available in less prejudicial form through the defendant's own words as related by Williams.[6] We disagree.

The following additional facts are germane to the defendant's claim. Prior to trial, the state sought to introduce a statement that was given to police by Rios on January 18, 2008, to establish the defendant's motive

[6] The defendant summarily asserts, without analysis or citation to legal authority, that Rios' statement "was inherently unreliable because it was given when Robert Rios was under the influence of alcohol or drugs . . . ." "[A]s we have stated on occasions too numerous to recite, mere abstract assertions, unaccompanied by reasoned analysis, will not suffice to apprise a court adequately of the precise nature of a claim." (Internal quotation marks omitted.) *State* v. *Davis*, 90 Conn. App. 263, 273, 876 A.2d 1265, cert. denied, 275 Conn. 928, 883 A.2d 1247 (2005). "Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Mims*, 61 Conn. App. 406, 410, 764 A.2d 222, cert. denied, 255 Conn. 944, 769 A.2d 60 (2001). Accordingly, we deem this claim abandoned.

on April 30, 2008.[7] Although the statement was typewritten by Detective Richard Baustien of the Meriden police department, Rios initialed it at the top and signed his name at the bottom. The defendant filed a motion in limine to preclude this statement, and the court held a hearing.

At the hearing, Rios testified that he remembered giving a statement on January 18, 2008, but had no recollection of what he had said. He further testified that on that day he had been drinking heavily, smoking marijuana and crack, and was not in the proper frame of mind to give an accurate statement. Additionally, he variably testified that he had been, and had not been, threatened by police to give the statement. Pursuant to

---

[7] The statement consisted of the following: "I Robert Rios am [eighteen] years old and I have lived in West Haven for the past four years. I went to school until the [eleventh] grade. I can read/write English. I don't have a job right now.

"Today I came to Meriden from New Haven at around 12:30 p.m. and met up with my friend, [the defendant], who I consider to be my best friend. I have known [the defendant] for about [three] years. I went to [the defendant's] house on Broad Street and I believe the apartment is A-1. We played video games (Madden 08) and smoked some 'piff' which is weed. [The defendant] started to tell me what happened the last couple of days. He said that he and his brother, [Tavonne], got into a fight on Wednesday after school with a group of guys from the Twiss [Street] gang. He went home with his brother after that.

"[The defendant] said that he was at home on Thursday after school with [Tavonne] and was standing outside when a group of guys and girls were walking towards his house. [The defendant] said that he felt threatened so he pulled out his gun and fired two shots at the crowd but nobody got hit. [The defendant] then ran into his house. [The defendant] said it was either a 38 or 32 revolver gun and he told me his cousin, Trevor Witherspoon, brought it up from New Haven. I think that [the defendant] called Trevor down in New Haven and he came to Meriden. [The defendant] gave Trevor the gun and he took it back to New Haven.

"[The defendant] showed me a box of [twenty-five millimeter] bullets that he has in his apartment. He said he was supposed to buy a new gun today. [The defendant] also said that Trevor was coming back up to Meriden tonight with the gun. They were going to shoot somebody or shoot up a party that was going on tonight or tomorrow at some girl Desire's house. [The defendant] also said that he did two other shootings in town."

*State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), the court first determined that the statement was sufficiently reliable. Then, after hearing argument by counsel on its relevance and prejudicial effect, the court admitted Rios' statement into evidence.[8] The court issued a limiting instruction immediately before the statement was read to the jury and again after Baustien testified as to Rios' state of mind at the time he gave the statement. A final limiting instruction was given during the court's final instructions to the jury.

"The principles guiding our review of a trial court's decision to admit prior uncharged misconduct evidence are well settled. Evidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for

---

[8] The court's ruling, in relevant part, stated: "[T]he court understands that the one component of uncharged misconduct the state is relying upon is motive. And I think it's important to note these two separate instances. The state alleges in their information that [the defendant] was involved with a conspiracy to commit assault with a weapon on or about April 30, 2008, in the city of Meriden. Involved in the information are the names of some of the alleged coconspirators, one of which is Trevor Witherspoon. The incident is also alleged that [the defendant] unlawfully discharged a weapon and was carrying a pistol without a permit and reckless endangerment. Now, the statement that is in evidence from Mr. Rios is close in time to the trial here, which is the April 30 incident. This is an incident that happened in January, 2008. So, four months is close in time. It apparently happened in the same city, Meriden, and the court notes with interest that, again, the name of Trevor Witherspoon is mentioned in this statement. It is also stated by Mr. Rios that [the defendant], and I'm quoting from the statement, '[the defendant] said [that] he felt threatened so he pulled out his gun and fired two shots at the crowd but nobody got hit.'

"So, in balancing the probative value and the prejudicial [effect], the court is going to allow this in as uncharged misconduct. The court will give the appropriate limiting instruction, and the jury could, you know, give it whatever weight [it sees] fit."

example, the evidence is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Millan,* supra, 290 Conn. 830.

"The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . [T]he burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant . . . [who] must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Dougherty,* 123 Conn. App. 872, 877, 3 A.3d 208, cert. denied, 299 Conn. 901, 10 A.3d 521 (2010). With these principles in mind, we turn to the defendant's claims.

A

The defendant first challenges the relevance of the information contained in the Rios statement. The defendant contends that the statement, specifically Rios' reference to the defendant's use of drugs, his involvement in a shooting at an unidentified approaching crowd four months prior, his possession of a box of twenty-five millimeter bullets, his plans to shoot someone or guests at "some girl Desire's house" and his confession to

two other shootings in town, was not relevant to the defendant's motive. We agree that the references to an episode of the defendant's drug use four months prior to the shooting and his claimed responsibility for two other shootings in town were not relevant and material to the defendant's motive. We conclude, however, that the defendant has not met his burden of establishing that it is more probable than not that the court's decision to allow the two references into evidence affected the result of his trial. We further conclude that the balance of the information contained in Rios' statement was relevant and material to the defendant's motive on April 30, 2008.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Allen*, 289 Conn. 550, 562, 958 A.2d 1214 (2008). "Evidence is material where it is offered to prove a fact directly in issue or a fact probative of a matter in issue. . . . Materiality is determined by the pleadings (or information) and the applicable substantive law." (Internal quotation marks omitted.) *State* v. *Dougherty*, supra, 123 Conn. App. 877–78.

In the amended information filed by the state, the defendant was accused of, among other things, conspiracy to commit assault in the first degree in violation of

§§ 53a-48 and 53a-59 (a) (1) and (5). As discussed in part I A of this opinion, conspiracy is a specific intent crime, and rarely is there direct evidence of a defendant's intent. The state, therefore, offered Rios' statement to prove that the defendant had a motive to commit assault in the first degree, making it more likely that he harbored the intent to commit assault in the first degree. Accordingly, in order for Rios' statement to be relevant and material, it had to show, even to a slight degree, that the defendant had a motive to engage in a conspiracy to commit assault in the first degree.

We conclude that the court abused its discretion in determining that the portions of Rios' statement referring to an isolated episode of the defendant's drug use and the defendant's responsibility for two other shootings in town were relevant to the defendant's motive.[9] In his statement, Rios stated that "[he] went to [the defendant's] house on Broad Street and . . . played video games (Madden 08) and smoked some 'piff' which is weed." The state did not allege that the defendant was addicted to drugs or that drug trade factored into the animosity that existed between the New Haven boys and the Twiss Street gang. Cf. *State* v. *Ali*, 92 Conn. App. 427, 434, 886 A.2d 449 (2005) (evidence of defendant's ongoing drug problem highly probative of his intent and motive to commit burglary that resulted in murder), cert. denied, 277 Conn. 909, 894 A.2d 990 (2006); *State* v. *Fisher*, 82 Conn. App. 412, 431, 844 A.2d 903 (evidence of defendant's drug addiction and use of drugs on day of alleged crime probative of motive to commit larceny), cert. denied, 269 Conn. 911, 852 A.2d 741 (2004). Additionally, we are unable to discern how the defendant's admission to two other unspecified shootings in town was probative of the defendant's motive. There are no

[9] We note, however, that at trial the defendant did not specifically identify and ask to have these two portions of Rios' statement excluded or redacted as irrelevant, immaterial or too prejudicial.

facts to indicate that the defendant committed these other shootings with his brother or Witherspoon or that members of the Twiss Street gang had been targeted. These two references were not relevant and, thus, did not render the existence of a motive more probable.[10]

We further conclude that the court did not abuse its discretion in determining that the balance of the evidence contained in Rios' statement was relevant to the defendant's motive. Rios' statement recounted that on a prior occasion Witherspoon provided the defendant with a .32 or .38 caliber firearm that was used to shoot twice at an approaching group of people. The statement recounted that the defendant felt threatened before that shooting and had been involved in a fight with members of the Twiss Street gang the day prior to that shooting, permitting the reasonable conclusion that the defendant had identified members of the Twiss Street gang approaching and shot at them. This evidence directly was probative of the defendant's motive and intent to commit assault in the first degree in April, 2008.

Rios' statement further recounted that the gun used in the prior shooting incident was then given back to Witherspoon, who took it back to New Haven. Rios explained that the defendant possessed a box of twenty-five millimeter bullets, intended to acquire a new gun and anticipated that Witherspoon was going to return to Meriden with a gun. Finally Rios recounted that "[t]hey were going to shoot somebody or shoot up a party that was going on tonight or tomorrow at some girl Desire's house." All of this evidence, which described the interaction of the defendant and Witherspoon in acquiring weapons and their intent to commit another shooting,

---

[10] We note also that in its brief to this court, the state failed to make any argument supporting a conclusion that the defendant's drug use was probative of motive. Additionally, at oral argument before this court the state recognized that "parts of the statement do seem to be irrelevant."

was probative of the existence of a conspiracy and tended to make the existence of the defendant's motive in April, 2008, more probable.

To the extent that the court abused its discretion by admitting the references to the isolated incident of the defendant's prior drug use and the defendant's claim to have committed two other unspecified shootings in town, we conclude that the defendant has not carried his burden of establishing that "it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Dougherty*, supra, 123 Conn. App. 877. Adorno testified that he heard gunshots and saw three individuals, two of whom were wearing distinctive jackets belonging to the defendant and his brother, holding their hands in a shooting posture. Williams testified that there was a significant level of animosity between the New Haven boys and the Twiss Street gang, and the defendant's admission that he had encountered people with whom he had a "beef" at the scene of the shooting permitted the reasonable inference that they were members of the Twiss Street gang. Four recently discharged shells were found at the scene, and forensics evidence established the presence of lead, a major component of gunshot residue, in the left-hand jacket pocket of the defendant, who is left-handed. We cannot say that in the face of such evidence, it is more probable than not that the jury was affected by the two isolated irrelevant portions of Rios' statement.

B

Relying on *State* v. *Collins*, 111 Conn. App. 730, 743, 961 A.2d 986 (2008), cert. granted, 290 Conn. 911, 964 A.2d 546 (2009), the defendant next asserts that the limited value of the portions of Rios' statement that were probative was outweighed by its prejudicial effect because (1) it cast the defendant as a gun toting criminal

with a proclivity for shooting people and (2) evidence of the defendant's motive was readily available in less prejudicial form through the testimony of Williams. We are not persuaded.

"Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The court bears the primary responsibility for conducting the balancing test to determine whether the probative value outweighs the prejudicial impact, and its conclusion will be disturbed only for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Zubrowski,* 101 Conn. App. 379, 394–95, 921 A.2d 667 (2007), appeal dismissed, 289 Conn. 55, 956 A.2d 578 (2008), cert. denied, 555 U.S. 1216, 129 S. Ct. 1533, 173 L. Ed. 2d 663 (2009).

"Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Conn. Code Evid. § 4-3. Unfair prejudice occurs "where the facts offered may unduly arouse the jury's emotions, hostility or sympathy . . . ." *State* v. *DeMatteo,* 186 Conn. 696, 702, 443 A.2d 915 (1982); see also *State* v. *Crafts,* 226 Conn. 237, 255, 627 A.2d 877 (1993) ("[t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury"). "Such undue prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous." (Internal quotation marks omitted.) *State* v. *Allen,* supra, 289 Conn. 564.

We cannot conclude that the court abused its discretion in balancing the probative value and prejudicial effect of Rios' statement. The statement did not unduly

distract the jury, consume an undue amount of time or surprise the defendant. Furthermore, it was not of such a nature as to *unduly* arouse the emotions, hostility or sympathy of the jury. The defendant's reliance on *State v. Collins*, supra, 111 Conn. App. 743, is misplaced.[11] The facts of that case are distinguishable from the present case. In *Collins*, the defendant was charged with murder, felony murder and robbery in the first degree in connection with a shooting death. Id., 732. At trial, the court admitted detailed evidence that, on a prior occasion, the defendant had been involved in a separate and distinct shooting of his cousin's husband. Id., 734–36. On appeal, this court determined that it was an abuse of discretion to admit detailed evidence of another shooting involving the defendant because the evidence was relevant only to the extent that it showed that the defendant previously had owned a gun that produced shell casings matching the ones found. Id., 743. As such, this court determined that the *irrelevant* details of the other shooting unduly aroused the emotions of the jury. Id.

In the present case, however, the defendant's prior uncharged misconduct concerned a confrontation with the Twiss Street gang and, with the exception of the isolated reference to the defendant's drug use and prior involvement in two unspecified shootings, it was relevant to the defendant's motive to engage in a conspiracy to commit assault in the first degree on April 30, 2008. Rios' statement recounted that the defendant previously had obtained a gun from Witherspoon that he and his brother used to shoot at an approaching crowd the day after a fight with members of the Twiss Street gang. The statement also recounted that the defendant already

---

[11] We note that our Supreme Court granted certiorari on the question: " 'Did the Appellate Court properly conclude that the trial court abused its discretion when it admitted evidence of the defendant's involvement in a prior shooting?' " *State* v. *Collins*, 290 Conn. 911, 964 A.2d 546 (2009).

possessed bullets, planned on acquiring a new gun that he would use to shoot somebody else and that Witherspoon was bringing the gun used on the previous occasion back to Meriden that day. This evidence was highly probative of the presence of a conspiracy between the defendant, his brother and Witherspoon, and, when analyzed in the context on the ongoing dispute between the two groups, established a motive for the April 30, 2008 shooting.

We also note that the court gave the jury a limiting instruction three times during the course of the trial. "[W]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact . . . we have found no abuse of discretion . . . ." (Internal quotation marks omitted.) *State* v. *Lynch*, 123 Conn. App. 479, 492–93, 1 A.3d 1254 (2010). "Absent evidence to the contrary, we presume that the jury followed the court's limiting instruction." (Internal quotation marks omitted.) Id., 493–94. Under these circumstances, we cannot conclude that the court abused its discretion in balancing the probative and prejudicial effect of Rios' statement.

The judgment is affirmed.

In this opinion the other judges concurred.