# STATE OF CONNECTICUT *v.* DESTER G. MCCOY
## (AC 25212)

DiPentima, Harper and Mihalakos, Js.

Argued April 29—officially released August 23, 2005

*Donald D. Dakers*, special public defender, for the appellant (defendant).

*Michael E. Criscuolo*, special deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *John J. Davenport*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Dester G. McCoy, appeals from the judgment of conviction, following a jury trial, of reckless manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55a (a) and 53a-55 (a) (3).[1] The defendant claims that the evidence does not support the conviction because it did not support a finding that he acted under circumstances evincing an extreme indifference to human life.[2] We affirm the judgment of the trial court.

The jury reasonably could have found that, at approximately 5 a.m., on April 8, 2001, the defendant went to the apartment of his girlfriend, the victim, in Waterbury. He entered the apartment with a nine millimeter pistol tucked inside the waistband of his pants. The defendant and the victim went to the victim's bedroom. The defendant removed the magazine from his pistol. While the victim was reclining on her bed, the defendant was getting undressed at the victim's bedside. While kneeling, either on or alongside the victim's bed, the defen-

---

[1] The jury found the defendant not guilty of intentional manslaughter with a firearm in violation of General Statutes §§ 53a-55a (a) and 53a-55 (a) (1). The court sentenced the defendant to a twenty-five year term of imprisonment.

[2] The defendant moved for a judgment of acquittal, raising the issue he now raises on appeal, at the close of the state's case, at the conclusion of the evidentiary phase of the trial and after the jury verdict. The court denied those motions.

dant picked up his pistol, pointed it in the victim's direction and pulled the trigger. The defendant shot the victim, at close range, in the thigh. The bullet traveled through the victim's pelvis and caused substantial internal injury in the victim's abdominal cavity. As a result, the victim died shortly thereafter. Additional facts will be set forth as necessary.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . In conducting this review, the probative force of the evidence is not diminished where the evidence, in whole or in part, is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Holmes*, 75 Conn. App. 721, 739–40, 817 A.2d 689, cert. denied, 264 Conn. 903, 823 A.2d 1222 (2003).

"A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses . . . a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ." General Statutes § 53a-55a (a). "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and

thereby causes the death of another person." General Statutes § 53a-55 (a).

The defendant concedes that, acting recklessly, he caused the victim's death. He challenges the jury's finding that he acted under circumstances evincing an extreme indifference to human life.

"Our Penal Code does not define, in title 53a of the General Statutes, what constitutes extreme indifference to human life. . . . Therefore, it is appropriate to look to the common understanding of the term as expressed in a dictionary. . . . This court has done so in the past. Examining the term as it is used in title 53a of the General Statutes, we have stated that the legislature modified the level of indifference required with the adjective extreme, which has been defined to mean existing in the highest or greatest possible degree. . . . It is synonymous with excessive. . . . What evinces an extreme indifference to human life is really a question of fact." (Citations omitted; internal quotation marks omitted.) *State* v. *Colon*, 71 Conn. App. 217, 225, 800 A.2d 1268, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002). "Extreme indifference to human life" has been defined accurately, in part, as more than "[m]ere carelessness" or ordinary recklessness. *State* v. *Spates*, 176 Conn. 227, 236, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979); see also *State* v. *Garcia*, 81 Conn. App. 294, 310, 838 A.2d 1064 (2004). "Extreme indifference to human life" also has been defined accurately, in part, as "a high degree of disinterest to human life." (Internal quotation marks omitted.) *State* v. *Bunker*, 27 Conn. App. 322, 326–27, 606 A.2d 30 (1992).

The defendant testified at trial concerning the events leading to the victim's death. The defendant testified that he spoke with the victim on the telephone before arriving at her apartment and that she let him in the

apartment.[3] He testified that he had his pistol, which he had owned at least since 2000, in the waistband of his pants. He testified that, once in the victim's bedroom, he removed the magazine from the pistol and began "playing" with the pistol while the victim was reclining in her bed. He testified that he squeezed the trigger of the pistol while it was aimed in the victim's direction but that he did not intentionally shoot the victim.[4] The defendant testified that he was not aware that a live round remained in the pistol's chamber after he had removed the magazine and that he did not intend to injure the victim. The defendant classified the shooting as "an accident" that occurred because he was "stupid enough to play with the gun."[5]

The defendant further testified that after he shot the victim, he attempted to call for help on the telephone, but that he was unable to complete the call because he was nervous. He recalled that he gave the telephone to a female whom he described as the victim's niece, who also was in the apartment, and that he returned

[3] The state presented evidence that during the evening hours of April 7, 2001, the victim and others spent time dining and socializing at a restaurant where the defendant was working as a cook. The evidence permitted a finding that the victim and the defendant engaged in a conversation at the restaurant, during which the defendant appeared to be upset or angry. Immediately following the conversation, the victim indicated that she wanted to leave, and did leave, the restaurant.

[4] The state presented testimony from Marshall Robinson, a firearms expert who examined the defendant's pistol. Robinson compared the defendant's pistol with "quality" nine millimeter semiautomatic pistols. Robinson testified that the defendant's pistol had a "heavy" trigger pull, that required 9.2 pounds of pressure on the trigger to discharge. By contrast, a "quality" comparable pistol required "around three and one-half to four pounds" of pressure on the trigger to discharge.

[5] The state presented expert testimony from Lucinda Lopes, a crime laboratory supervisor for the Waterbury police department. Lopes opined, on the basis of the results of testing that she performed using the defendant's pistol, that the defendant fired the pistol from a distance of between one and six inches from the victim.

to the victim's bedroom.[6] He lifted the comforter that was covering the victim and observed her injuries and that she was bleeding. The defendant testified that, motivated by thoughts about the police arriving on the scene, he collected his pistol, the magazine he had removed from the pistol and the shell casing from the bullet he had fired at the victim and left the apartment. The defendant further testified that three to four minutes later, he returned to the apartment and asked the victim's niece whether she had called for help. He testified that, after learning that help was on the way, he fled the scene.

The defendant testified that he hid the pistol under some shrubbery in an alley and that he walked to an area in the vicinity of the train station in Waterbury. The defendant recalled that he soon observed police officers and that while he was walking, they approached him and asked if he was connected with the shooting, and that he told them that the shooting was "an accident."

Edward Apicella, a police officer with the Waterbury police department, testified that on April 8, 2001, he was on patrol duty when he received a report concerning a shooting suspect. Apicella testified that he drove his police cruiser to an area near the train station in Waterbury where he saw a male, who matched the description of the shooting suspect, "walking very quickly" along a street. Apicella testified that he and his partner exited their cruiser and approached the individual, the defen-

---

[6] The victim's daughter testified that she was in the apartment on the night of the shooting. She testified that she was awakened by the sound of a gunshot and that shortly thereafter, the defendant entered her bedroom and told her to call for an ambulance. She further testified that after initially leaving the apartment, the defendant returned briefly and then left the apartment again. It is not clear from the record whether the female whom the defendant described as the victim's "niece" was, in fact, the victim's daughter.

dant. He testified that the defendant appeared to be startled upon seeing the officers and immediately stated to them: "I didn't mean to shoot her." Apicella testified that he restrained the defendant, patted him down and advised him of his *Miranda* rights.[7] Apicella testified that he found a nine millimeter shell casing in the defendant's pants pocket. Apicella also testified that, once in custody, the defendant stated: "I didn't mean to shoot her. I didn't know how the gun works." The defendant voluntarily led the police to the alley where he concealed his pistol. The police recovered the pistol under some shrubbery.

The relevant factual issue before the jury was whether the defendant "had the general intent to engage in conduct that created a grave risk of death to another person under circumstances evincing an extreme indifference to human life." *State* v. *Best*, 56 Conn. App. 742, 754, 745 A.2d 223, cert. denied, 253 Conn. 902, 753 A.2d 937 (2000). Where, as here, factual issues exist that are related to a defendant's intent, "we recognize that such factual issues are characteristically proven by circumstantial evidence. . . . It is obvious that direct evidence of the accused's state of mind is rarely available and, therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Eastwood*, 83 Conn. App. 452, 464, 850 A.2d 234 (2004). Accordingly, the defendant's state of mind at the time of the shooting may be proven by his conduct before, during and after the shooting. "Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." *State* v. *Best*, supra, 756.

---

[7] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

On the basis of the cumulative effect of all of the evidence, a rational jury could have found that the defendant acted with the intent to engage in conduct evincing an extreme indifference to human life. The defendant, by his own admission, was "playing" with the pistol when he pointed it in the direction of the victim and intentionally pulled the trigger. The jury could have found that the defendant intentionally engaged in that conduct while he was uncertain of whether a live round remained in the pistol. The defendant told the police that he "did not know how the gun works" and testified that he was unaware that a live round remained in the pistol's chamber when he handled the pistol in the manner that he did. It was reasonable for the jury to conclude that this conduct reflected more than recklessness or carelessness, but an extreme degree of disinterest in the victim's life.

Apart from evidence of that conduct, which supports the jury's finding that the defendant possessed the requisite mental state required for the commission of the crime, the jury heard evidence of the defendant's conduct after he had shot the victim. Almost immediately after the shooting, the defendant engaged in a pattern of conduct reflecting not a desire to save the victim's life, but a desire to evade police apprehension. From the evidence presented, the jury reasonably could have found that the defendant was aware of the serious nature of the injuries that he had inflicted on the victim, as well as the chaotic and traumatic scene that he had left in his wake in the victim's apartment at an early hour of the morning. After asking the victim's daughter to call for help, the defendant returned to the victim's bedside. Rather than taking steps to comfort or to assist the victim, the defendant gathered his pistol, the magazine and the bullet casing from the victim's bed. The defendant left the apartment, returned only momentarily to ascertain whether help was on the way and

then distanced himself from the aftermath of the trauma he created. The defendant hid his gun under shrubbery in an alley and was found by police "walking very quickly" along the street, away from the scene of the crime. That pattern of conduct after the shooting evidenced more than the defendant's consciousness of guilt.[8] That pattern of conduct reflected the defendant's profound disinterest in the victim's life and supported a finding that the defendant was not merely reckless or careless in creating a risk of death but acted with an extreme indifference to human life.[9]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[8] The court instructed the jury that it could consider unexplained evidence of flight or concealment of evidence by the defendant as conduct influenced by the defendant's consciousness of guilt.

[9] The defendant also claims that the court abused its discretion by failing to grant one of his motions for a judgment of acquittal. See footnote 2. The defendant asserts that the court did not apply the proper legal standard in ruling on his motion and, during the sentencing proceeding of the trial, expressed its belief that the evidence did not support a finding that the defendant had acted with extreme indifference to human life. In light of our holding that the evidence supported the conviction, we need not address that separately briefed claim. Our holding renders harmless any error with regard to the court's rulings on the acquittal motions.