******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* LISSETTE
I. CHICLANA
(AC 34863)

DiPentima, C. J., and Keller and Dupont, Js.

*Argued November 18, 2013—officially released April 1, 2014*

(Appeal from Superior Court, judicial district of New Haven, B. Fischer, J.)

*Janice Wolf*, assistant public defender, for the appellant (defendant).

*Lisa Herskowitz*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Eugene R. Calistro, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Lissette I. Chiclana, appeals from the judgment of conviction, rendered after a trial by jury, of manslaughter in the second degree with a firearm in violation of General Statutes § 53a-56a.[1] On appeal, the defendant raises two evidentiary claims relating to a portion of a recorded statement that she made following her arrest, wherein she described an incident involving the accidental discharge of a firearm the night before the commission of this crime. The defendant contends that the statement was inadmissible because (1) the trial court should have considered it to be evidence of uncharged misconduct, and, if it had done so, it would have concluded that its prejudicial impact outweighed its probative value, and (2) it was not relevant to the issues of the case. We disagree, and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On October 24, 2010, the defendant shot and killed the victim, Jamese Hudson, in an apartment on Garden Street in New Haven, where the defendant resided with four other individuals.[2] The victim was friends with the defendant, as well as the other occupants of the apartment, and had been staying there for several days just prior to the shooting. On the day of the shooting, the defendant and the victim were reclining on two twin beds in the defendant's bedroom and sending text messages on their cell phones. While doing so, they intermittently "played" with a .380 caliber handgun that the defendant had purchased for self-protection.[3] For several weeks prior to the shooting, the defendant and the victim had been, as the defendant described it, "playing" this "game" with the gun. As part of this "game," the defendant and the victim took turns pointing the gun at one another and pulling the trigger. They engaged the safety mechanism so that it would not fire when the trigger was pulled. They "played" this "game" between twenty and thirty times over the course of several weeks, despite being forewarned not to do so.

The day of the shooting, the defendant and the victim each pulled the trigger of the gun several times without its firing. The defendant was aware that the handgun was loaded, but continued to pull the trigger because she believed the safety mechanism to be engaged. At approximately 1:30 p.m., however, the defendant pointed the gun in the victim's direction, pulled the trigger, and the gun fired unexpectedly. As a result, the defendant, at close range, inflicted a fatal gunshot to the victim's head.[4] While fleeing the apartment, the defendant informed another occupant, Jasmine Vreeland, that she accidentally had shot the victim. Vreeland exited the apartment and asked a neighbor to call 911. The defendant was arrested later that day and charged with one count of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a)

and one count of carrying a pistol without a permit in violation of General Statutes § 29-35 (a).

At trial, the state offered into evidence, outside the presence of the jury, an audiotape of a statement made by the defendant, following her arrest, to Detectives Michael Wuchek and James Naccarato of the New Haven Police Department. The defendant's counsel objected to a portion of the statement in which the defendant described to the detectives an incident involving the same gun that had occurred on October 23, 2010, the night before the shooting.[5] The defendant told the detectives that at approximately 10 p.m., she had the gun in her pocket while she was in the kitchen of the Garden Street apartment. The victim also was present in the apartment at that time. The defendant stated that because her pocket was not large enough to fully fit the gun, it fell from her pocket and fired a single time. The defendant stated that the gun had "jammed." Although the defendant was not aware where the bullet went, she recovered the shell and discarded it in the trash. After this accidental discharge, the defendant told the detectives that three bullets remained in the clip of the gun.[6] Over defense counsel's objection, the court allowed the state to play the audiotape of the defendant's statement in its entirety and to provide the jury with a transcript thereof.

The defendant was charged with one count of manslaughter in the first degree with a firearm in violation of § 53a-55a (a)[7] and one count of carrying a pistol without a permit in violation of § 29-35 (a). As an alternative to manslaughter in the first degree, the court charged the jury as to the lesser included offenses of manslaughter in the second degree with a firearm in violation of § 53a-56a[8] and criminally negligent homicide in violation of General Statutes § 53a-58.[9]

On April 12, 2012, the jury found the defendant not guilty of manslaughter in the first degree with a firearm, but guilty of manslaughter in the second degree with a firearm and carrying a pistol without a permit. On June 8, 2012, the court imposed a total effective sentence of fifteen years incarceration, execution suspended after eleven years, and three years probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first contends that the portion of her statement relating to the accidental discharge of the gun the night before the shooting constituted evidence of prior uncharged misconduct and, accordingly, the court should have assessed its admissibility as such.[10] The defendant argues that if the court had done so, it would have concluded that the statement did not meet one of the exceptions to the general bar on evidence of uncharged misconduct, its prejudicial impact out-

weighed its probative value, and it therefore constituted inadmissible evidence of uncharged misconduct. In response, the state argues that the defendant's claim is not reviewable because defense counsel did not object on this basis at trial. We agree with the state and decline to review this claim because it was not raised before the trial court and, therefore, was not preserved for our review.

The record reveals the following additional procedural history. At trial, the state sought, outside of the presence of the jury and over defense counsel's objection, to introduce into evidence the audiotape of the defendant's statement relating to the accidental discharge. In his offer of proof, the prosecutor argued that the evidence was admissible pursuant to *State* v. *McCoy*, 91 Conn. App. 1, 879 A.2d 534, cert. denied, 276 Conn. 904, 884 A.2d 1026 (2005), and *State* v. *McMahon*, 257 Conn. 544, 778 A.2d 847 (2001), cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002), indicating that in *McCoy*, this court held that a "defendant's state of mind at the time he fatally shot the victim may be proven by his conduct before, during, and after the shooting." The prosecutor argued that the statement was thus admissible because it was relevant to establishing the defendant's state of mind at the time of the shooting, specifically, that she acted with reckless disregard and extreme indifference to human life, as required by §§ 53a-55 (a) and 53a-55a. See footnote 7 of this opinion. The court then took a brief recess to permit the court and defense counsel to review the case law that the prosecutor had brought to the attention of the court.

After the recess, the defendant argued that the accidental discharge did not constitute conduct, as the gun merely had fallen from her pocket and the discharge was not volitional, and that the statement was not relevant to the subsequent accidental shooting of the victim.[11] In ruling that the evidence was admissible, the court, paraphrasing *McCoy*, stated: "[T]he defendant's state of mind at that time of the shooting may be proven by his or her conduct before, during, and after the shooting. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state. And the evidentiary issue in front of this court, the weapon used is the same weapon that the state alleges is used in the shooting that occurred on October 24, 2010, and it's within a twenty-four hour period of the date the state alleges that the manslaughter occurred. So, the court makes the following finding, that *this evidence is relevant*, the jury can consider it, the jury could give whatever weight they feel—they see fit to give to this evidence concerning the discharge of the same weapon the night before in the apartment where the defendant and the victim were also together the night before. So, I will allow it in."

(Emphasis added.)

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling." (Internal quotation marks omitted.) *State* v. *Jorge P.*, 308 Conn. 740, 753, 66 A.3d 869 (2013). "Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection [to the trial court]. . . . This court reviews rulings solely on the ground on which the party's objection is based. . . . [T]o afford petitioners on appeal an opportunity to raise different theories of objection would amount to ambush of the trial court because, [h]ad specific objections been made at trial, the court would have had the opportunity to . . . respond." (Citation omitted; internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 297 Conn. 105, 133–34, 998 A.2d 730 (2010).

Our careful review of the record and trial transcripts reveals that the defendant did not object to the admission of her statement concerning the accidental discharge of the gun on the ground that the statement constituted inadmissible uncharged misconduct evidence. The prosecutor offered the defendant's statement as evidence relevant to proving the defendant's state of mind at the time she fatally shot the victim, and the court admitted the statement on that ground. The defendant acknowledges that the court admitted her statement concerning the accidental discharge as relevant evidence of the crime with which she was charged, rather than as evidence of uncharged misconduct, and never during the course of trial did defense counsel suggest that the statement constituted evidence of uncharged misconduct. Notably, the defendant did not file a motion in limine seeking the preclusion of uncharged misconduct evidence or request a limiting instruction as to the restricted purpose for which the jury might consider the statement. Indeed, the defendant argued that the accidental dropping of the gun did not, in fact, constitute conduct. The defendant did not assert any alternate ground for the objection, or object in any manner to other evidence, presented later at trial, pertaining to the accidental discharge.

For instance, after the state offered the defendant's statement into evidence over the defendant's objection, it proceeded to present other evidence indicating that the gun in question had discharged the day before the shooting.[12] The state presented the testimony of Detective Mark Harkins of the New Haven Police Department,

who testified that on October 25, 2010, he was assigned to investigate an unlawful discharge incident that occurred at the Garden Street apartment, and that he recovered a bullet embedded in a closet of an adjacent apartment. He indicated that, on the basis of the trajectory of the bullet, it likely came from the defendant's apartment. Moreover, the defendant herself testified on cross-examination that on the night of October 23, 2010, the gun had fallen from her pocket and unexpectedly discharged when it struck the ground. She further testified that she believed that the gun had then "jammed." This testimony was admitted without objection.

Our Supreme Court has explained that, to afford petitioners on appeal an opportunity to raise different theories of objection would "amount to ambush of the trial court because, [h]ad specific objections been made at trial, the court would have had the opportunity to . . . respond." (Internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 297 Conn. 134. In her objection and the ensuing argument, the defendant failed to provide the court with any notice that she was objecting on the ground that the statement constituted inadmissible uncharged misconduct. She then failed to object to other evidence, presented later at trial, pertaining to the accidental discharge. In sum, because the defendant's theory of objection seemingly has changed, and never was articulated with precision at trial, we conclude that the claim is not reviewable.

We must, however, briefly address the defendant's argument that this claim is preserved because, in a pretrial notice of prior uncharged misconduct, the state identified the incident of the accidental discharge as evidence of uncharged misconduct that it may seek to adduce at trial.[13] The defendant contends that this notice preserved her claim for review because "[i]t is clear . . . that the evidence of the unintentional discharge of the weapon from the night prior to the fatal shooting of [the victim], if it was to be admitted at all, would be limited in its admission to the rules that govern uncharged misconduct." This argument is without merit. Although the state filed a notice of intent to offer evidence of uncharged misconduct in which it identified the accidental discharge, at trial, the state ultimately did not offer the statement for that purpose. Rather, it was offered generally as evidence relevant to the defendant's state of mind. We are aware of no authority stating that once a party identifies evidence as uncharged misconduct in a pretrial disclosure, it is precluded at the time of trial from offering such evidence for a proper purpose under an alternative theory of admissibility. Indeed, our case law suggests the opposite. See *State* v. *Hill*, 307 Conn. 689, 704, 59 A.3d 196 (2013) ("once the evidence can be admitted for a proper purpose, that evidence no longer should be barred as misconduct evidence because it has not been proffered

for that impermissible purpose"); *State* v. *Gant*, 231 Conn. 43, 58, 646 A.2d 835 (1994) ("We also reject the defendant's assertion that this evidence [of his threatening someone with a gun] constituted 'prior misconduct' or 'bad character' evidence that prejudiced the defendant. The state never offered this evidence for the purposes argued by the defendant on appeal, and the trial court never gave such instructions to the jury."), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995); *State* v. *Huckabee*, 41 Conn. App. 565, 581, 677 A.2d 452 (*Schaller*, *J.*, dissenting) ("The evidence was not offered as evidence of misconduct for the purpose of impeaching the credibility of the defendant or for showing a criminal propensity. I conclude, therefore, that [the] testimony on this matter does not constitute misconduct evidence."), cert. denied, 239 Conn. 903, 682 A.2d 1009 (1996).

Finally, we reject the defendant's argument that this claimed error, though unpreserved, should be reviewed under the plain error doctrine. See Practice Book § 60-5. "[T]he plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [T]he claimed error must be both clear and harmful enough such that a failure to remedy the error would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Hill*, supra, 307 Conn. 704–705. We are not persuaded by the defendant's summary assertion that this evidentiary claim warrants such extraordinary review. The defendant has not demonstrated that the alleged impropriety she raises is so clear and so harmful that manifest injustice will result if the judgment is not reversed. Nor has she shown that her claim affects the fairness and integrity of and public confidence in judicial proceedings. We therefore conclude that this is not an occasion requiring the reversal of the trial court's judgment under the plain error doctrine.

II

The defendant next claims that the court abused its discretion by admitting her statement to the police relating to the accidental discharge of the gun because the statement was not relevant to the issues in the case. Specifically, the defendant argues that her statement concerning the gun accidentally falling from her pocket the night before the fatal shooting was not relevant and should not have been admitted for the purpose of showing that she acted recklessly and with a disregard for human life. She summarily asserts that the statement "did not have a visible connection to the facts of the charged offense," and that the "gun dropping from the defendant's pocket the night before [the fatal shooting] was totally unconnected to [the victim] or to the shooting of [the victim] the next day." We are not persuaded.

At the outset, we first set forth the appropriate stan-

dard of review and applicable legal principles. "This court reviews evidentiary rulings under the abuse of discretion standard of review. . . . The trial court has wide discretion to determine the relevancy of evidence . . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Stephen O.*, 106 Conn. App. 717, 724, 943 A.2d 477, cert. denied, 287 Conn. 916, 951 A.2d 568 (2008).

It is axiomatic that evidence that is not relevant is inadmissible. Conn. Code Evid. § 4-2. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . Evidence is material where it is offered to prove a fact directly in issue or a fact probative of a matter in issue. . . . Materiality is determined by the pleadings (or information) and the applicable substantive law." (Citation omitted; internal quotation marks omitted.) *State* v. *Kantorowski*, 144 Conn. App. 477, 487–88, 72 A.3d 1228, cert. denied, 310 Conn. 924, 77 A.3d 141 (2013).

To obtain a conviction of manslaughter in the first degree with a firearm in violation of § 53a-55a (a), as charged, the state bore the burden of proving that the defendant "commit[ed] manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense [she] use[d] . . . a pistol, revolver . . . or other firearm. . . ." In turn, "[t]o obtain a [manslaughter] conviction under [§ ] 53a-55 (a) (3) . . . the state must prove that the defendant (1) engaged in conduct which creates a risk of death, (2) in so doing, [she] acted recklessly[14] (3) under circumstances evincing an extreme indifference to human life and (4) that [her] conduct caused the death . . . of another person." (Internal quotation marks omitted.) *State* v. *McMahon*, supra, 257 Conn. 567–68. The state argues, as it did at trial, that the defendant's statements concerning the accidental discharge of the gun the night before the shooting were relevant to establishing that the defendant acted recklessly and with an extreme indifference to human life at the time of the shooting the next day.

The relevant factual issue before the jury was whether the defendant was "aware of and consciously disregard[ed] a substantial and unjustifiable risk . . . of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ." General Statutes § 53a-3 (13). "Where, as here, factual issues exist that are related to a defendant's [state of mind], we recognize that such factual issues are characteristically proven by circumstantial evidence. . . . It is obvious that direct evidence of the accused's state of mind is rarely available and, therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Accordingly, the defendant's state of mind at the time of the shooting may be proven by [her] conduct before, during and after the shooting." (Citation omitted; internal quotation marks omitted.) *State* v. *McCoy*, supra, 91 Conn. App. 7.

We agree with the state that the statement concerning the accidental discharge was relevant to proving that the defendant acted recklessly the day of the fatal shooting. The defendant's statement indicates that the defendant was aware that the gun could discharge unexpectedly, and proof of such awareness strongly tends to demonstrate recklessness. See General Statutes § 53a-3 (13). The defendant stated that at the time of the accidental discharge the gun had "jammed," and later, at trial, testified that she did not take any actions to unjam it or ensure that it was functioning properly the next day. She further acknowledged in her statement that she was aware that three bullets remained in the clip of the gun. This evidence undoubtedly aided the jury reasonably to determine that the defendant acted recklessly and with extreme indifference to human life when she decided to, by her own admission, "play" with the gun by pointing it in the direction of her friend and pulling the trigger the day after it unexpectedly discharged. The jury was tasked with determining the mental state of the defendant. It was well within the court's discretion to admit evidence of conduct occurring less than twenty-four hours before the time of the commission of the crime, where it goes to her knowledge and awareness of the existing circumstances posing a substantial and unjustifiable risk. It tended to show that she was aware that the gun could discharge easily and that it was functional. Accordingly, because awareness of the defective operation and dangerousness of the gun was integral to demonstrating recklessness, the trial court did not abuse its discretion in concluding that the defendant's statement relating to the accidental discharge was relevant.

Finally, even if the court improperly admitted the statement relating to the accidental discharge, which

we conclude was not the case, the error was harmless. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [O]ur Supreme Court [has] addressed harmless error review and determined that the proper standard is whether the jury's verdict was substantially swayed by the error. Our Supreme Court further held that a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Franko*, 142 Conn. App. 451, 460, 64 A.3d 807, cert. denied, 310 Conn. 901, 75 A.3d 30 (2013).

The defendant argues that admitting the statements relating to the accidental discharge "substantially swayed" the jury, and had they not been admitted, "the jury would have seen [the defendant's] role in [the victim's] death as it was, negligent."[15] We disagree. The remaining evidence amply supported the jury's finding that the defendant acted in a reckless manner and was sufficient for the jury to have found the defendant guilty of manslaughter in the second degree with a firearm. Although the defendant objected to the admissibility of the statement, additional evidence concerning the accidental discharge—including the defendant's own testimony on cross-examination—was admitted without objection. The jury, therefore, was aware that the defendant knew that the gun could discharge unexpectedly. Furthermore, the defendant testified that she had been "playing" with the gun when she pointed it in the direction of the victim and intentionally pulled the trigger. The jury heard testimony that she had been "playing" this "game" for several weeks, despite having been warned not do so. The defendant testified that she purchased the gun and bullets "on the street" and never took a firearms safety course. The defendant testified that, although she was aware that guns have the capacity to kill, the activity of pointing the gun at each other and pulling the trigger was "just a game for [her and the victim]." She stated that although she believed that the safety mechanism was engaged, she did not remove the clip or bullets from the gun prior to pointing it at the victim and pulling the trigger. Given the cumulative impact of the undisputed facts, a jury reasonably could have concluded that the defendant consciously disregarded a substantial and unjustifiable risk of causing the death of another person by routinely pointing a loaded gun at another individual and pulling the trigger—regardless of whether the safety mechanism is engaged. On the basis of this evidence, we have a fair assurance that the defendant's statement describing the accidental discharge did not substantially affect the verdict.

Under the given circumstances, with due regard for the broad leeway possessed by trial courts in determin-

ing the admissibility of evidence, we conclude that the court did not abuse its broad discretion in admitting the statement describing the accidental discharge of the firearm that occurred the night before the death of the victim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also was charged with and convicted of carrying a pistol without a permit in violation of General Statutes § 29-35 (a). She does not appeal from the conviction of that crime.

[2] On October 24, 2010, the defendant was nineteen years old and the victim was sixteen years old.

[3] The defendant purchased the gun for $600 in either March or April, 2010, after her boyfriend had been fatally shot outside of her home. She testified that she purchased the gun and the bullets with which it was loaded "on the street." Furthermore, the state presented the testimony of Detective Michael Wuchek of the New Haven Police Department, who testified that no gun permit had been issued to the defendant.

[4] The state presented testimony from Dr. Ira Kanfer, an assistant medical examiner who performed the autopsy of the victim. Kanfer opined that the defendant fired the gun from a distance of eighteen inches from the victim. He also identified the victim's cause of death to be a gunshot wound to the head.

[5] The following colloquy between the defendant and the detectives constitutes the portion of the audiotape to which the defense objected:

"[Detective Wuchek]: Okay, um is this the first time that gun ever went off?

"[The Defendant]: No.

"Q. By accident.

"A. No, it went off by accident in the kitchen yesterday. It had fell out of my pocket while I was trying to heat up some food.

"Q. At what time did that happen about?

"A. I don't know what time that happened.

"Q. Was it in the morning or at night?

"A. It was at night.

"Q. It was late night or just nighttime?

"A. Mm, just nighttime like ten.

"Q. And uh you had the gun on you while you were cooking food?

"A. No, I wasn't cooking food. I was trying to heat up my food that I had just went and got from my family, my other family house.

"Q. [All right]. And then what happened you dropped it?

"A. Yeah cause my pocket wasn't big enough to hold it so it just dropped out of my pocket and [went] off.

"Q. So when it fell it went off?

"A. Mm hm.

"Q. How many times did it go off?

"A. Just went off once. It jammed.

"Q. And was [the victim] in the house with you at that time?

"A. Yes, she was.

"Q. Okay.

"A. She kind'a thought it was funny. Our ears were all ringing.

"Q. Were either of you two hurt?

"A. No.

"Q. Do you know what happened to the bullet? Where the bullet went?

"A. No, but I know where the shell was at.

"Q. What did you do with the shell?

"A. Discard of it.

"Q. How did you discard of it? Did you throw it in the garbage can? Did you flush it down the toilet? What did you do?

"A. I discarded it. Do I have to say how I discarded it?

"Q. Yeah if you could.

"A. I was like I just threw it out in the trash. . . .

"Q. And uh it had three bullets in the . . .

"A. Three bullets.

"Q. Left.

"A. In the clip, yes."

[6] At trial, Mark Harkins, a detective with the New Haven Police Department, testified that the bullet was recovered from an adjacent apartment where it was found embedded in the ceiling of a closet.

[7] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of . . . a pistol, revolver . . . or other firearm. . . ."

General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[8] General Statutes § 53a-56a (a) provides in relevant part: "A person is guilty of manslaughter in the second degree with a firearm when he commits manslaughter in the second degree as provided in section 53a-56, and in the commission of such offense he uses . . . a pistol . . . or other firearm. . . ."

General Statutes § 53a-56 (a) provides in relevant part: "A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

[9] General Statutes § 53a-58 (a) provides in relevant part: "A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person . . . ."

We note that in instructing the jury with respect to criminally negligent homicide, the court referenced General Statutes § 53a-54 instead of § 53a-58. The defendant has not raised any claim in this regard. Section 53a-54 was repealed in 1973. See Public Acts 1973, No. 73-137, § 15. Any discrepancy, however, is harmless as the court applied the correct law. In instructing the jury as to this charge, the court stated: "A person is guilty of criminal[ly] negligent homicide when, with criminal negligence, she causes the death of another person." See *State* v. *Johnson*, 288 Conn. 236, 285, 951 A.2d 1257 (2008) ("[a]s long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper" [internal quotation marks omitted]).

[10] "Evidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for example, the evidence is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." (Internal quotation marks omitted.) *State* v. *Pena*, 301 Conn. 669, 673–74, 22 A.3d 611 (2011).

[11] Specifically, defense counsel stated: "[*McCoy*] does talk about conduct before, during, and after the incident. The fact that something fell out of someone's pocket does not constitute conduct. . . . It is—it's the same weapon, that's correct, but I think the offer of proof relates to the state of mind and conduct on the part of the defendant, and, in fact, that really isn't conduct at all. *I don't think it's relevant at all to what happened the following day.*" (Emphasis added.)

[12] Reference was also made to the accidental discharge, without objection, before the state offered the statement into evidence. Vreeland, the defendant's housemate, had testified that on the night of October 23, 2010, she was in the Garden Street apartment when she heard a gunshot. She testified that the defendant and the victim were also both present in the Garden Street apartment at the time. Vreeland, however, did not know the source of the gunshot and, at the time, believed that it originated from outside the apartment.

[13] On January 13, 2011, the defendant filed a motion for disclosure of uncharged misconduct, which the court granted on January 26, 2011. In response, on November 29, 2011, the state filed a notice of prior uncharged misconduct in which it notified the defendant of its intent to offer evidence related to the "prior incident of discharge of a firearm on or about the 23rd day of October, 2010, in the [Garden Street apartment], by this same defendant." Trial commenced on April 9, 2012, some four months after the state filed its notice.

[14] General Statutes § 53a-3 (13) provides: "A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an

offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ."

[15] "A person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ." General Statutes § 53a-3 (14).