******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ANTHONY HUDSON
## (AC 38647)

Sheldon, Keller and Bishop, Js.

*Syllabus*

Convicted of the crime of conspiracy to commit assault in the first degree, the defendant appealed to this court, claiming that there was insufficient evidence to support his conviction. The defendant was allegedly involved in the beating death of the victim that was committed by R, who lived in an apartment with the defendant and the victim. The defendant and R allegedly had discussed the assault beforehand, and R carried out the assault in the shared apartment, which resulted in the victim's death. *Held* that the evidence was sufficient to support the defendant's conviction of conspiracy to commit assault in the first degree, as the jury reasonably could have drawn the inference that the beating of the victim had been administered by R in furtherance of a mutual plan between R and the defendant that the assault of the victim be carried out, which each man had entered into for his own reasons: although the killing of the victim and the disposal of his body were perpetrated by R without help from the defendant, in light of the evidence presented showing, inter alia, that the defendant had been advised of R's plan before it was set in motion, was present in the apartment when the beating took place but did nothing before or during the beating either to warn the victim of its likely occurrence or to stop it once it had begun, and expressed relief and satisfaction after he saw what R had done to the victim, the jury reasonably could have found beyond a reasonable doubt that the defendant had conspired with R to commit assault in the first degree by inflicting serious physical injury on the victim by means of a dangerous instrument and that R had committed an overt act in furtherance of that conspiracy.

Argued October 17, 2017—officially released March 27, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of assault in the first degree as an accessory and conspiracy to commit assault in the first degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Mullarkey, J.*; verdict and judgment of guilty of conspiracy to commit assault in the first degree, from which the defendant appealed to this court. *Affirmed.*

*Douglas H. Butler*, assigned counsel, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Thomas Garcia*, former assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Anthony Hudson, appeals from the judgment of conviction rendered against him following a jury trial on the charge of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59 (a) (1). On appeal, the defendant claims that there was insufficient evidence to support his conviction. We disagree, and thus affirm the judgment of the trial court.

On July 19, 2013, two hikers reported a "very unusual" odor to the Suffield Police Department, which they discovered while out on a bike path in a wooded area in West Suffield. Officer John Lacic was dispatched to investigate the hikers' report. Upon arriving in the wooded area, Lacic also noticed a strong odor, which he determined to be coming from a blue duffle bag containing a dead human body. Lacic was later joined at the scene by other personnel from the Suffield Police Department and the Connecticut State Police Major Crime Squad. The hands and feet of the man in the duffle bag had been tied behind his back with rope, and tape had been wrapped around his head, feet and body. The body was taken to the Chief Medical Examiner's Office in Farmington for autopsy and identification. Based upon his fingerprints, the victim was identified as Peter Boateng.

After identifying Boateng, a police investigation into his death ensued. Detective Joseph Fargnoli, of the Major Crimes Division of the Hartford Police Department, went to 171 South Marshall Street to verify Boateng's address. Fargnoli observed Boateng's name on the apartment's mailbox. Upon returning to his vehicle, which he had parked in the rear of the building, Fargnoli was approached by three individuals: Megan Cowles, Jose Rodriguez and the defendant. Fargnoli told them that Boateng was at the Hartford police station filing a complaint that his property had been taken from the apartment, which appeared to surprise them. When Fargnoli asked them if Boateng resided with them, they responded that Boateng had moved out of the apartment approximately one week earlier, then invited Fargnoli into the apartment. Upon entering the apartment through the kitchen, Fargnoli observed a bedroom area with a crib in it. He also "noticed what appeared to be a blood stain on the carpet" and detected a smell "like there had been a dead body in the apartment."

On July 22, 2013, Fargnoli returned to 171 South Marshall Street with a warrant to search the apartment. While conducting the search, he noticed that there were bloodstains on the wall and ceiling of the apartment. Members of the search team seized the bloodstained area of carpeting that he had observed when he initially entered the apartment earlier, in addition to a baby

blanket that had been used to cover up that stain. They also seized a hatchet, a hammer and a baseball bat. Two cadaver dogs were brought in to search the apartment for the scent of human remains. Both alerted at a bedroom just inside the front door and at the carpet beneath the crib. One of the dogs was also directed to search the interior of Boateng's car, which had been towed from the apartment. The dog alerted to the interior of the trunk of the car.

Fargnoli, along with three additional law enforcement officers, interviewed the apartment's occupants. They first approached the defendant, who was "trembling" and "shaking" as he told the officers that Boateng had moved out of the apartment the week before. The defendant agreed to accompany the officers to the police station for further discussion. During that discussion, the defendant changed his story, explaining that Rodriguez had killed Boateng due to an escalating conflict between himself and Boateng regarding the rent. While the interrogation of the defendant continued, Rodriguez and Cowles also were brought to the police station for questioning, during which the following information, which ultimately led to the arrest of all three of them, was learned.

In May, 2013, Rodriguez was kicked out of the Salvation Army shelter in Hartford, where he had been living with Cowles and their infant daughter. Soon thereafter, Rodriguez ran into the defendant while walking down the street. Although they had known each other since approximately 1989, they had not seen each other for several years. Upon learning that Rodriguez was homeless, the defendant invited Rodriguez to stay at his two-bedroom apartment on South Marshall Street. Rodriguez accepted the defendant's offer and moved into the apartment with the defendant and Peter Boateng. The defendant and Boateng each stayed in one of the bedrooms, while Rodriguez slept in the living room.

Eventually, Cowles and her daughter also moved into the defendant's apartment, where they slept in the living room with Rodriguez. Shortly after Cowles moved in, Rodriguez overheard Boateng heatedly yelling and cursing at Cowles and his daughter. Rodriguez intervened by yelling at Boateng to stop disrespecting Cowles, and Boateng apologized.

At one point, a conflict arose between the defendant and Boateng because Boateng had paid his share of the rent to the defendant's estranged wife instead of paying it to the defendant so he could pay the landlord. As a result, the defendant was unable to fulfill his obligation to pay the landlord. Thereafter, the defendant repeatedly asked Boateng for the rent, but Boateng refused, causing the conflict between them to escalate. Although the police were called to the apartment on two occasions to respond to arguments between the defendant and Boateng, neither was arrested as a result of those

calls. Because of this conflict, the defendant wanted Boateng to move out of the apartment.

Not surprisingly, the events leading up to and culminating in the beating and death of Boateng on July 10, 2013, and the events of that evening, as conveyed by the defendant, Rodriguez and Cowles, were disputed. The defendant and Rodriguez signed written statements to the police upon their respective arrests, which were admitted into evidence at trial. The defendant did not testify at trial, but Rodriguez did. Cowles did not give a written statement to the police when she was arrested, but she testified at trial. We examine each of these key pieces of evidence as the jury was free to believe all or any portion of each of them.

We begin with the defendant's July 23, 2013 written statement to the police, in which the defendant explained that a dispute had arisen between him and Boateng because Boateng had paid his rent to the defendant's estranged wife instead of the defendant, which left the defendant unable to fulfill his obligation to pay their landlord. The defendant repeatedly asked Boateng for the rent, but Boateng refused, causing the conflict between them to escalate, which led to the police being called to their home a couple of times. Nobody was arrested as a result of those calls. The defendant averred, inter alia: "[On July 10, 2013,] I told [Rodriguez] I was going to take [Boateng] to court. [Rodriguez] said no, it was going to take too long. I said I was going to take care of it and [Rodriguez] said no he would take care of it. [Rodriguez] said [Boateng] was going to disappear and that I shouldn't say anything about it. [Rodriguez] said he was used to it. I didn't take [Rodriguez'] word for it. [Rodriguez] said I better not open my mouth and his eyes turned like the devil came out. I told [Rodriguez] don't do that, don't make that man disappear. [Rodriguez] said he was going to dispose of all of [Boateng's] stuff. [Rodriguez] said he was going to burn all of [Boateng's] stuff and it would be gone. [Rodriguez] said he was going to dump [Boateng's] body where nobody was going to find it. [Boateng] was in his room when me and [Rodriguez] talked. Me and [Rodriguez] were in [Rodriguez'] room. I didn't do anything because I didn't take [Rodriguez] at his word. I didn't tell [Boateng] because [Rodriguez] said all of this right [at Boateng's] bedroom door and I thought [Boateng] heard everything.

"Later that night I was getting ready to go to sleep and [Rodriguez] told me [Boateng] was leaving and was going to disappear tonight. I went to bed. I heard a noise like someone saying 'Ugh' and it was coming from [Boateng's] room. A little while later, about midnight, I got up to go to the bathroom. I saw [Boateng] in his room and he was tied up with a little ball in his mouth. He was on the floor with his head aiming toward my bedroom door. His hands were tied behind his back

and his feet were tied behind him. He was tied like cattle. [Boateng] was only wearing blue shorts. [Boateng] looked at me like why? I couldn't do anything. I saw [Rodriguez] and [Cowles] were in [Boateng's] room with him. [Rodriguez] was wearing all black. I don't remember what [Cowles] was wearing. I saw that [Rodriguez] was beat on the head, he was bleeding, blood was just dripping off his head. [Rodriguez] told me to go use the bathroom and go back to my room. I went to the bathroom and then I heard another sound like 'Ugh' and the sound of something popping him. It was [Boateng] making that sound and the other sound was him getting hit. [Boateng] couldn't say anything because of the ball in his mouth. I came out of the bathroom and saw [Rodriguez] and [Cowles] in [Boateng]'s room and [Boateng] was still on the floor tied up, but he wasn't moving. [Rodriguez] told me to go back to bed and in the morning everything would be taken care of and [Boateng] would be gone. [Rodriguez] said [Boateng's] body would be dumped somewhere where it would never be found. When I went into my bedroom [Rodriguez] and [Cowles] were still in [Boateng's] room and [Boateng] was still on the floor. I went back to bed and laid on my bed. I fell asleep. I heard some more hits. It sounded like [Boateng] was being beat. [Boateng] had stopped making sound. [Rodriguez] and [Cowles] were whispering, it was quiet so I couldn't hear what they were saying. Then everything went silent in [Boateng's] room." The defendant heard Boateng's car "[peel] out of the backyard down the driveway" at about 4:00 or 5:00 a.m. When he awoke at 10:00 a.m., nobody was home and everything but a bed and chair had been removed from Boateng's room. The defendant saw "blood all over the rug and the room smelled like someone died in there."[1]

Rodriguez also gave a written statement to the police when he was arrested on July 23, 2013. In his statement, he explained that the defendant argued frequently with Boateng because Boateng had paid his rent to the defendant's estranged wife instead of directly to him. Rodriguez also stated that Boateng was "always coming into the apartment after work drunk and acting obnoxious" and that Boateng "treated [Cowles] very disrespectfully." Rodriguez asked Boateng "to have some respect and not be disrespectful to [Cowles] all the time."

Rodriguez averred: "[On] July 10th or the 11th [the defendant] told me that he couldn't take [Boateng] anymore. I knew that night I was going to take care of [Boateng] and I was planning on taking a bat that I had in the apartment and I wanted to hit [Boateng] and just scare him to teach him a lesson. I told [the defendant] not to sweat it, that he should rest easy and I was going to take care of [Boateng]. Later that night [Boateng] came home and was acting stupid slamming doors and knocking around pots and pans in the kitchen. I don't know what happened I took the bat and went into

[Boateng's] bedroom and I hit him in the head with the bat a few times. [Boateng] fell to the floor and I knew I was past the point of no return and I was committed. I hit [Boateng] a few more times in the head and I knew I had killed him. As I was hitting [Boateng] [the defendant] came into the room. I told him everything was all set, go to the bathroom and [the defendant] walked out of the room.

"I took some rope that I had in the apartment from moving in and I tied [Boateng's] hands and feet up behind his back. I took [Boateng's] body and I put him into a big blue suit case with wheels that I have had for years. As I was putting the body into the bag [Cowles] walked into the bedroom and freaked out and got really scared. I told her I was sorry and I didn't mean to fuck up this bad. I told her I was sorry and that I wanted to make things right with her and my family." Rodriguez then explained that Cowles helped him dispose of Boateng's body in a wooded area in Suffield.[2]

Rodriguez also testified for the defendant at the defendant's trial. Rodriguez testified that on the night of July 10, 2013, sometime after midnight, everybody was asleep when he awoke, got up and went to use the bathroom. Rodriguez explained that after he used the bathroom, he opened the door and, "[Boateng] took a swing at me and we tussled. . . . [M]e and him got into it, we tussled. I tussled him into the bedroom because the way the bathroom, the living space where me and my spouse and my child was sleepin' and his bedroom, like his door and the bathroom door were only probably not even three feet away from each other. And so we were in between his bedroom door and the bathroom door. . . . So we tussled into his room because I didn't want it to—I didn't want the physical violence to end up on top of my daughter or [Cowles]. So I preferred that—since it got to this level to just try to tussle him into the bedroom and I did. We were going—we were going shot for shot." Rodriguez testified that Boateng "dropped to the ground" where he "started to grab a hammer." In response, Rodriguez left the bedroom to retrieve an aluminum bat. Upon his return to the bedroom, Boateng swung at Rodriguez with the hammer, but Rodriguez knocked the hammer out of Boateng's hands with the bat. At that point, Rodriguez testified that he "lost it" and "started [hitting] him with the bat" and that he hit Boateng several times until Boateng fell to the floor. Rodriguez testified that Boateng was bleeding and moaning from pain and "eventually lost consciousness." Rodriguez stopped hitting Boateng, but he knew that he "had hit him already one too many times." He then saw Cowles and the defendant in the doorway, and "they looked like they were in shock." He stated that the defendant never entered Boateng's room that night. Twenty minutes passed after Boateng became unresponsive before Rodriguez thought to get some garbage bags from the

kitchen to dispose of Boateng's body. He tied a bandana over Boateng's mouth and used a piece of rope to tie Boateng's ankles and hands together behind his back. Rodriguez testified that he put Boateng's body into a garbage bag and then into the trunk of Boateng's car. He stated that he then "just drove," not knowing where he was going, and then exited the highway onto a dark road. He testified that Cowles was not with him.

Rodriguez confirmed that the defendant did not have anything to do with the incident that night and that the incident "just transpired in split seconds prior to a dispute." Rodriguez testified that although there had been an incident about a week earlier, when Boateng had verbally disrespected Cowles, he had not had any further conflicts with Boateng until Boateng attacked him as he emerged from the bathroom on the night of July 10, 2013. He interpreted Boateng's attack as "very personal" and worried for the safety of Cowles and his daughter. Rodriguez explained that he had not planned to kill Boateng, but that it just "transpired in—within minutes."

Cowles testified at the defendant's trial on behalf of the state.[3] Cowles testified that between the time when she moved into the apartment and the night when Boateng was killed, she had several opportunities to observe the defendant and Boateng interact. She described those interactions as 40 percent "casual" and 60 percent "confrontational." She indicated that "[t]hey had been in several fights after consuming alcohol. There were two instances where the police were called because of physical altercations between them."

Cowles testified that about three days before July 10, 2013, she observed the defendant standing in the doorway to Boateng's bedroom with a hammer in one hand and a hatchet in the other, and heard him tell Boateng, "you're gonna leave here peacefully or you're going to leave here in pieces." On another occasion, when Cowles heard the defendant discussing Boateng's continued residence in the apartment with Rodriguez, she heard him tell Rodriguez that he wanted Boateng out of the apartment, and that he did not "care how he goes, dead or alive, that he wanted him out."

At about 11:30 p.m. on July 10, 2013, Cowles was awakened by the "sound of . . . Boateng being hit with the baseball bat." She then went into Boateng's room, where she found Rodriguez, who was still holding a baseball bat, and saw Boateng "on the floor kind of making convulsion movements." She then observed "a large laceration in the back of [Boateng's] head" and saw, looking around the bedroom, that there was "a lot of blood everywhere."

Cowles testified that she saw the defendant enter Boateng's room one time. When the defendant entered Boateng's room, Boateng's arms had been tied and a

small ball had been shoved into his mouth, held in place by a "bandana [tied] around his face." The defendant went over to Boateng and "forcibly moved [Boateng's] head out of the way" with his foot, "like you would push over a rock to see what's underneath it." The defendant then said to Boateng: "[L]ook at you now, motherfucker, you should have just paid me." The defendant also exclaimed, "hallelujah," and stated "that he was finally going to get the peace that he had been looking for." As the defendant left Boateng's room, he shook Rodriguez' hand "like he was grateful." Cowles testified that she later helped Rodriguez to remove Boateng's dead body from the apartment.[4]

The defendant was charged initially with murder as an accessory, conspiracy to commit murder, and tampering with physical evidence. Later, however, by way of a substitute long form information filed on July 8, 2015, the state reduced the charges to one count each of accessory to assault in the first degree in violation of § 53a-59 (a) (1) and General Statutes § 53a-8, and conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (1). After a jury trial on the substituted charges, the defendant was acquitted of accessory to assault in the first degree but convicted of conspiracy to commit assault in the first degree. The defendant was ultimately sentenced on his conspiracy conviction to a term of eighteen years incarceration. This appeal followed.

On appeal, the defendant claims that the evidence adduced at trial was insufficient to support his conviction of conspiracy to commit assault in the first degree. For the following reasons, we are not persuaded.

"It is well settled that a defendant who asserts an insufficiency of the evidence claim bears an arduous burden. . . . [F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried . . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic

fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . .

"[O]n appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error. . . . [T]he trier of fact may credit part of a witness' testimony and reject other parts. . . . [W]e must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Raynor*, 175 Conn. App. 409, 424–26, 167 A.3d 1076, cert. granted, 327 Conn. 969, 173 A.3d 952 (2017).

"A person is guilty of assault in the first degree when . . . [w]ith intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or a dangerous instrument . . . ." General Statutes § 53a-59 (a) (1). A "[d]angerous instrument" is defined as "any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ." General Statutes § 53a-3 (7). "Serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." General Statutes § 53a-3 (4). "Assault in the first degree is a specific intent crime. It requires that the criminal actor possess the specific intent to cause serious physical injury to another person." (Internal quotation marks omitted.) *State* v. *Sivak*, 84 Conn. App. 105, 110, 852 A.2d 812, cert. denied, 271 Conn. 916, 859 A.2d 573 (2004).

"To establish the crime of conspiracy under § 53a-48 . . . it must be shown that an agreement was made

between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Danforth*, 315 Conn. 518, 531–32, 108 A.3d 1060 (2015). "Although mere presence at a crime scene, standing alone, generally is insufficient to infer an agreement, a defendant's knowing and willing participation in a conspiracy nevertheless may be inferred from his presence at critical stages of the conspiracy that could not be explained by happenstance . . . ." (Internal quotation marks omitted.) *State* v. *Rosado*, 134 Conn. App. 505, 511, 39 A.3d 1156, cert. denied, 305 Conn. 905, 44 A.3d 181 (2012).

"[T]he existence of a formal agreement between the conspirators need not be proved [however] because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. . . . Finally, [b]ecause direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citation omitted; internal quotation marks omitted.) *State* v. *Danforth*, supra, 315 Conn. 532–33.

"[T]o be convicted of conspiracy, a defendant must specifically intend that every element of the planned offense be accomplished, even an element that itself carries no specific intent requirement." *State* v. *Pond*, 315 Conn. 451, 453, 108 A.3d 1083 (2015). "[T]he question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a ques-

tion for the jury to decide. . . . [T]he defendant's state of mind may be proven by his conduct before, during and after the [conduct constituting the overt act in furtherance of the conspiracy]." (Citation omitted; internal quotation marks omitted.) *State* v. *Douglas*, 126 Conn. App. 192, 204, 11 A.3d 699, cert. denied, 300 Conn. 926, 15 A.3d 628 (2011).

There is no question, on this record, that the killing of Boateng was perpetrated by Rodriguez without help from the defendant, either in administering the fatal beating or in setting it up. The jury's acquittal of the defendant on the charge of accessory to assault in the first degree was entirely consistent with the evidence in this regard. It is also clear from the evidence that the defendant played no role in removing Boateng's body from the apartment or the disposing of it in West Suffield. All of these aspects of Rodriguez' plan to "take care of" Boateng were handled by Rodriguez, with the assistance of Cowles, before they returned to the apartment and moved into Boateng's blood-stained bedroom with their infant child.

On the other hand, the defendant admits, and the testimony of Rodriguez and Cowles clearly confirms, that the defendant had been advised of Rodriguez' plan before it was set in motion, and he was present in the apartment when the beating took place, but he did nothing before or during the beating either to warn Boateng of its likely occurrence or to stop it once it had begun. Furthermore, the defendant expressed only relief and satisfaction after he saw what Rodriguez had done to Boateng, as evidenced by his cry of "hallelujah," his exclamation that now he would be able to live in peace, and his handshake with Rodriguez as he walked out of the bedroom after seeing Boateng on the floor and being told by Rodriguez that Boateng would be gone from the apartment by morning.

The question presented by this evidence is whether it showed only passive acquiescence in or approval of criminal conduct that the defendant had played no role at all in bringing about, or supported a reasonable inference, in light of all the other evidence presented at trial, that the beating had been administered by Rodriguez in furtherance of a mutual plan between Rodriguez and the defendant that the assault of Boateng be carried out. We conclude that the jury reasonably could have drawn the latter inference, and on that basis, considering all of the evidence in the light most favorable to the state, reasonably could have found the defendant guilty of conspiring with Rodriguez to commit assault in the first degree.

First, although Rodriguez undoubtedly had his own personal reasons for disliking Boateng based upon Boateng's disrespectful treatment of Cowles and his loud, disruptive behavior in the apartment, he was also well aware of the defendant's disgruntlement with

Boateng because of Boateng's failure to pay his share of the rent. Thus, although Rodriguez had no involvement in either of the angry confrontations between the defendant and Boateng that led to the police being called to the apartment, he had witnessed those incidents and fully understood why the defendant felt as he did.

Second, Rodriguez knew that the extent of the defendant's unhappiness with Boateng was so substantial that he had threatened Boateng with physical violence, a fact that he had confirmed for Rodriguez shortly before the assault by telling him that he wanted to have Boateng removed from the apartment, dead or alive. Thus, when Rodriguez announced his plan to "take care of" Boateng by disposing of his body where no one would ever find it, he was doing no more than proposing to act on the defendant's own prior threats to Boateng, which was something that he, Rodriguez, claimed to have experience in doing. Although the defendant, who claimed that he only wanted to sue Boateng for eviction, stated that he did not believe Rodriguez was serious about his plan to make Boateng disappear, he still claims to have felt it necessary to tell Rodriguez not to "make that man disappear." The jury, of course, could freely have disbelieved that claim. Even, however, if the defendant did make such a statement to Rodriguez, he was admittedly told by Rodriguez later that same day that the plan to take care of Boateng would be executed that very evening.

Third, when the defendant entered Boateng's bedroom after hearing the sounds of a beating and of a man moaning, he admittedly saw Boateng, gagged and hog-tied on the floor but still alive, yet did nothing to help Boateng or to renew his claimed protest to Rodriguez not to make Boateng disappear. To the contrary, according to Cowles, he acted disrespectfully toward Boateng, turning his head over with his foot and telling him, "motherfucker, you should have just paid me." By these words, the defendant made it clear that, at least in his eyes, the reason why Rodriguez had assaulted Boateng was to punish him for not paying his share of the rent—a matter in which Rodriguez had no personal interest. That causative link between Boateng's refusal to pay rent and his beating by Rodriguez, which the defendant expressly admitted to in his written statement to the police, supports the inference that Rodriguez had administered the beating in furtherance of a mutual agreement to do so between himself and the defendant, which each man had entered into for his own personal reasons.

Fourth, the defendant's spontaneous expressions of joy and satisfaction upon seeing the initial results of Rodriguez' beating of Boateng support the inference, which Cowles suggested in her testimony, that he was thereby thanking Rodriguez for what he had done. Their

handshake at the end of that brief encounter, which followed Rodriguez' statement to the defendant that Boateng would be gone from the apartment by morning, could reasonably have supported the inference that, in the defendant's view, the beating was being carried out in furtherance of his and Rodriguez' mutual plan.

Fifth and finally, when the defendant walked out of Boateng's bedroom after he and Rodriguez shook hands, knowing that Boateng was still alive but that he would be dead and gone by morning, the jury could reasonably have inferred that he and Rodriguez had agreed that Rodriguez should finish the job by using the bat to beat Boateng further, thereby causing him additional serious physical injury involving a substantial risk of death, before removing his body from the apartment and disposing of it where no one would ever find it. On the basis of such inferences, the jury could reasonably have found beyond a reasonable doubt that the defendant had conspired with Rodriguez to commit assault in the first degree by inflicting serious physical injury upon Boateng by means of a dangerous instrument, and that Rodriguez had committed an overt act in furtherance of that conspiracy.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In his statement, the defendant went on to explain the events subsequent to Boateng's death, including how Boateng's room was cleaned and that Rodriguez and Cowles moved into that room with their baby. Because the state did not argue at trial that anything that happened after the night of Boateng's murder formed the basis of its conspiracy charge against the defendant, we need not go into detail about those events in this opinion.

[2] Rodriguez also told the police, in his written statement, how he cleaned Boateng's bedroom and disposed of his belongings. Because those actions did not form the basis of the state's conspiracy charge at trial, we need not recite them in detail herein.

[3] The written statement that Cowles gave to the police was not introduced into evidence at the defendant's trial.

[4] Cowles testified that Boateng was dead when they were transporting him to Suffield. She confirmed that she had tested his pulse and it wasn't there. It is not clear from the record exactly when she did this or when Boateng died. Cowles also testified that she tried to clean Boateng's room after the murder. Again, because the state did not base its conspiracy charge against the defendant on anything that took place after the murder, we need not recite those events in detail.